# 24-1040-CR

**To be argued by:**
**ALLEGRA GLASHAUSSER**

United States Court of Appeals
For the Second Circuit

Docket No. 24-1040-cr

UNITED STATES OF AMERICA,

Appellee,

-against-

PATRICE RUNNER,

Defendant- Appellant.

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLANT PATRICK RUNNER**

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**PATRICE RUNNER**

**ALLEGRA GLASHUSSER,**
Of Counsel

# TABLE OF CONTENTS

**Page(s)**

Statement of Jurisdiction ................................................................... 1

Questions Presented ......................................................................... 2

Statement of the Case ....................................................................... 2

Statement of Facts ........................................................................... 3

    The indictment and motion to dismiss .......................................... 4

Trial ................................................................................................ 8

Prosecution Case ............................................................................. 8

    The mail-order astrology business ............................................... 8

    Letters and products .................................................................. 10

    Customers ordered again and again. ........................................... 14

    The mechanics of the mail-order business .................................. 15

    Negative publicity and regulatory risks ...................................... 17

    2004 administrative action ......................................................... 20

    Customers were looking for "hope" ............................................ 24

Defense Case .................................................................................. 24

Motion to dismiss ........................................................................... 26

Charge conference, summations, jury instructions, and verdict. ....... 28

Post-verdict motion to dismiss ........................................................ 31

Objection to the guidelines loss amount .......................................... 33

Summary of Argument ................................................................ 36

Argument ................................................................................... 38

Point I

The indictment against Mr. Runner alleged that he committed fraud because his astrology company did not provide the real, personalized psychic magic it promised. The indictment was legally insufficient because it failed to allege that Mr. Runner had any intent to harm a property interest ............................................................................. 38

    A.   Standard of Review ........................................................ 38

    B.   The essential elements of fraud. .................................... 38

        i.   The intended harm must be connected to property ................................... 41

    C.   Mr. Runner's indictment didn't allege an intent to harm tangible property. .. 43

Point II

The trial evidence was similarly insufficient because it did not prove that Mr. Runner intended to harm his customers, who valued his products, and any possible harm was to intangible beliefs in psychics, magic, and hope. ................................................. 46

    A.   Standard of review........................................................ 46

    B.   The evidence was insufficient to show that Mr. Runner had the intent to harm any tangible property interest ................................................. 47

        i.   The customers received the intangible value they sought............................ 48

        ii.   Mr. Runner and his employees believed their customers were satisfied and tried to keep them satisfied ................................................. 49

        iii.   Evidence that Mr. Runner tried to avoid regulators by changing his company name and address, and avoiding civil liability did not prove

intent to harm.................................................................................... 51

    iv.  That the objects weren't "unique" was not material or harmful............... 52

  C.  The district court's ruling relied on a theory abrogated by *Ciminelli* ............... 53

Point III

The court erred in not instructing the jury on the legal theory that was
the crux of the defense case: that the government had to prove that
Mr. Runner intended harm.................................................................................. 55

Point IV

The court incorrectly calculated the guidelines loss as the entire revenue from
Mr. Runner's business, ignoring evidence that some customers were satisfied
with the astrological letters and products.......................................................... 57

Conclusion................................................................................................... 61

## TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Adams v. Alexandria*,
   878 F. Supp. 2d 685 (W.D. La. 2012) .............................................. 44

*Argello v. City of Lincoln*,
   143 F.3d 1152 (8th Cir. 1998) .................................................... 6, 44

*Ciminelli v. United States*,
   598 U.S. 306 (2023) ................................................... 41, 42, 44, 45

*Jackson v. Virginia*,
   443 U.S. 307 (1979) .................................................................... 47

*Kelly v. United States*,
   590 U.S. 391 (2020) .................................................................... 42

*Nefedro v. Montgomery*,
   996 A.2d 850 (Md. App. Ct. 2010) ................................................ 44

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012) ...................................................... 38, 46

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015) ................................................... passim

*United States v. Botti*,
   711 F.3d 299 (2d Cir. 2013) ......................................................... 55

*United States v. Capers*,
   20 F.4th 105 (2d Cir. 2021) ......................................................... 55

*United States v. Cavera*,
   550 F.3d 180 (2d Cir. 2008) ......................................................... 58

iv

*United States v. Chandler,*
   98 F.3d 711 (2d Cir. 1996) ............................................................ 56

*United States v. Coppola,*
   671 F.3d 220 (2d Cir. 2012) ........................................................... 58

*United States v. D'Amato,*
   39 F.3d 1249 (2d Cir. 1994) ........................................................... 39

*United States v. Dinome,*
   86 F.3d 277 (2d Cir. 1996) ............................................................ 39

*United States v. Drayer,*
   364 F. App'x 716 (2d Cir. 2010) ..................................................... 60

*United States v. Espaillet,*
   380 F.3d 713 (2d Cir. 2004) ........................................................... 47

*United States v. Gaines,*
   457 F.3d 238 (2d Cir. 2006) ........................................................... 57

*United States v. Glenn,*
   312 F.3d 58 (2d Cir. 2002) ............................................................ 47

*United States v. Greenberg,*
   835 F.3d 295 (2d Cir. 2016) ........................................................... 39

*United States v. Jabar,*
   19 F.4th 66 (2d Cir. 2021) ............................................................. 39

*United States v. Johnson,*
   945 F.3d 606 (2d Cir. 2019) ...................................................... 32, 53

*United States v. Jones,*
   393 F.3d 107 (2d Cir. 2004) ........................................................... 47

v

*United States v. Kozeny,*
    667 F.3d 122 (2d Cir. 2011) ........................................................ 46

*United States v. Kousisis,*
    82 F.4th 230 (3d Cir. 2023) ........................................................ 43

*United States v. Leslie,*
    103 F.3d 1093 (2d Cir. 1997) ..................................................... 46

*United States v. Mahaffy,*
    693 F.3d 113 (2d Cir. 2012) ....................................................... 55

*United States v. Milheiser*
    98 F.4th 935 (9th Cir. 2024) ...................................................... 43

*United States v. Mittelstaedt,*
    31 F.3d 1208 (2d Cir. 1994) ....................................................... 40

*United States v. Moseley,*
    980 F.3d 9 (2d Cir. 2020) ........................................................... 59

*United States v. Novak,*
    443 F.3d 150 (2d Cir. 2006) ...............................................6, 39, 44

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000) ......................................................... 38

*United States v. Powell,*
    831 F. App'x 24 (2d Cir. 2020) .................................................. 58

*United States v. Regent,*
    421 F.2d 1174 (2d Cir. 1970) ........................................ 6, 40, 41, 43

*United States v. Rainford,*
    110 F.4th 455 (2d Cir. 2024) ...................................................... 59

*United States v. Shellef,*
507 F.3d 82 (2d Cir. 2007) ...................................................................passim

*United States v. Silver,*
864 F.3d 102 (2d Cir. 2017) ....................................................... 56

*United States v. Starr,*
816 F.2d 94 (2d Cir. 1987) ...................................................................passim

*United States v. Stevens,*
2022 WL 2704522 (S.D. Fla. May 2, 2022).........................................32, 34, 53

*United States v. Torres,*
604 F.3d 58 (2d Cir. 2010) ............................................................ 47

*United States v. Uddin,*
551 F.3d 176 (2d Cir. 2009) .......................................................... 59

*United States v. Weaver,*
860 F.3d 90 (2d Cir. 2017) ....................................................... 39, 40

*Vill. of Schaumburg v. Petke,*
373 N.E.2d 716 (Ill. App. 3d 1978) .............................................. 45

**Statutes**

18 U.S.C. § 3231 ........................................................................................ 1

18 U.S.C. § 3742(a) ................................................................................... 1

18 U.S.C. § 1341 ................................................................................. 2, 38

18 U.S.C. § 1343 ................................................................................. 2, 38

28 U.S.C. § 1291 ........................................................................................ 1

**Rules**

U.S.S.G. §2B1.1(b)(1)(N)........................................................................ 33

**Other Authorities**

Kubzansky LD, et al, "Optimism and risk of incident hypertension: a target for
primordial prevention," Epidemiol Psychiatr Sci. 2020 Aug 14 ................................ 48


Laranjeira C, Querido A., "Hope and Optimism as an Opportunity to Improve the
'Positive Mental Health' Demand." Front Psychol. 2022 Feb 24 ............................. 48


Johns Hopkins Medicine, "The Power of Positive Thinking," available at,
https://www.hopkinsmedicine.org/health/wellness-and-prevention/the-power-of-
positive-thinking ................................................................................................................. 48

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

Docket No. 24-1040-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

PATRICE RUNNER,

Defendant-Appellant.

_____
APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

BRIEF FOR APPELLANT PATRICE RUNNER
_____

### Statement of Jurisdiction

The district court had jurisdiction under 18 U.S.C. § 3231 and entered

judgment on April 21, 2024 (Hon. Joanna Seybert). A notice of appeal was timely filed

on April 18, 2024. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. §

3742(a).

1

## Questions Presented

1. The indictment against Mr. Runner alleged that he committed fraud because his astrology company did not provide the real, personalized, psychic magic it promised. Was this indictment legally insufficient because it failed to allege that Mr. Runner had any intent to harm a property interest?

2. Was the trial evidence similarly insufficient because it did not prove that Mr. Runner intended to harm his customers, who valued his products, and any possible harm was to intangible beliefs in psychics, magic, and hope?

3. Did the court err in not instructing the jury on the legal theory that was the crux of the defense case: that the government had to prove that Mr. Runner intended harm?

4. Did the court incorrectly calculate the guidelines loss as the entire revenue from Mr. Runner's business, ignoring evidence that some customers were satisfied with the astrological letters and products?

## Statement of the Case

Patrice Runner was convicted after a jury trial of wire and mail fraud, conspiracy to commit wire and mail fraud, and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1343, 1341, 1349 & 1956. The court sentenced him to 120 months' incarceration and three years' supervised release. Mr. Runner is currently incarcerated.

2

## Statement of Facts

For 20 years, Patrice Runner ran a mail-order astrology business that sold items for good luck, including crystals, statues, and rings, and sent letters offering intangible services, such as telepathy, seances, and lucky numbers. The letters were written as if they came from Maria Duval, a French woman, who worked as a psychic, and licensed her name and picture to Mr. Runner. Customers received the crystals, statues, rings, and lucky numbers they ordered. They also received booklets, recordings, and letters of hope and inspiration, explaining how telepathy, seances, and visions could improve their luck. About half the customers ordered more than once and employees believed these customers were satisfied.

The government, however, charged Mr. Runner with fraud, on the theory that it was criminal that the magic the company offered was fake, that the items they sold were not unique, and that no psychic had visions, conducted seances, or communicated telepathically. The defense argued the indictment was legally insufficient. Of course, the magic wasn't real – the items weren't imbued with special luck-giving properties – but that was not fraud. Mr. Runner's business sold the experience of believing in magic and luck; he intended no harm. The court denied the defense motion.

At trial, the government proved that Mr. Runner's business did not sell real magic. A computer chose the lucky numbers, not someone who could see the future.

3

No one had visions, the items were not supernatural, and Mr. Runner wrote the letters.

Customers testified they were seeking hope when they responded to the letters. And a marketing expert explained that some goods and services, like astrological products or magic shows, are sold for their subjective experiential value. People buying these products often value the experience of imagination or mystery.

The court again denied the defense motion to dismiss, saying that the jury should decide the intent to harm. Subsequently, however, the court cut the jury instruction on intent to harm, the crux of the defense. The jury convicted Mr. Runner of 14 counts.

At sentencing, the court recognized that some customers were satisfied, but, nonetheless used the entire revenue of Mr. Runner's business as the guidelines' loss amount. It sentenced Mr. Runner to 10 years' incarceration.

<u>The indictment and motion to dismiss.</u>

Mr. Runner was charged in an 18-count indictment with, *inter alia*, mail and wire fraud for his astrology business that sent letters, which "fraudulently purported to be individualized communications from" "world-renowned psychics." A. 21.[1]

---

[1] Numbers preceded by "A" and "SPA" refer to pages of the appendix and special appendix. Docket ("Dkt") citations are to ECF case #18-cr-578.

Customers were "induced" to "pay fees in exchange for purportedly personalized astrological services" or "supposedly unique and supernatural objects." A. 21. It alleged that a psychic didn't "provide[ ] any personalized astrological services" and the objects weren't "unique and supernatural." A. 23-24. The letters were "mass-produced form letters, not from psychics"; the letters said that a psychic had a "specific vision" that "led the psychic to write the letter," but, actually, Mr. Runner got the potential customers' "names and addresses from mailing lists." *Id.* The indictment also alleged that Mr. Runner changed the name of his company to "hide [his] involvement in the scheme." A. 22.

In a motion to dismiss, the defense conceded that the indictment alleged that the letters from Mr. Runner's company were "deceitful" because they inaccurately said they were written by Maria Duval, a French psychic, and they inaccurately purported to provide magical services, such as telepathy. Dkt. 37. It argued, however, that the indictment did not sufficiently allege a cognizable intended harm. *Id.* Instead, people received the benefit of their bargain; they received "psychic services" and objects that "appeared to be magical and personalized." *Id.* at 14. Had the letters marketed the literal truth – that there was nothing supernatural or magical about them – that would have destroyed their value, just as a magician who reveals the source of her trick destroys the value of the magic for the audience. The defense also argued that the indictment not only did not allege that any customers were harmed, but also alleged

5

the contrary: the customers were repeat buyers, indicating they were happy with their purchases.

In support, the defense cited cases explaining that psychic services provide entertainment. *Id.*, citing, *inter alia*, *Argello v. City of Lincoln*, 143 F.3d 1152 (8th Cir. 1998). The defense also cited cases holding that deceit that "cause[s] [customers] to enter into transactions that they would otherwise avoid," is not fraud when the customers received the "benefit of the bargain." *Id.*, citing, *inter alia*, *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007); *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006); *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987); and *United States v. Regent*, 421 F.2d 1174 (2d Cir. 1970). Here, the benefit of the bargain was the entertainment, which the customers received.

In response, the government said the intent to harm was alleged by stating that the "object and purpose of the scheme was to obtain money from the Victims by means of [the] false and fraudulent statements and material concealments of fact in the letters." Dkt. 41 at 9, quoting A. 23, and citing *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015).

 The government argued that it was material that "no psychics performed any astrological services" and the customers did not receive "unique and magical objects," while the letters stated that a "psychic will be providing individualized psychic services" and that the "items purchasers will receive are unique and magical." Dkt. 41.

6

The government argued that the lack of psychics or magic impacted the "quality…of the goods themselves." *Id.* at 10. It said that the "bargain" was the "personalized psychic service," so a "misrepresentation that the items…are unique and magical…go[es] directly to that nature of the bargain." *Id.* at 14.

In denying the motion to dismiss, the court agreed with the defense that "the worth of the psychic goods and services…is derivative of, *inter alia*, the entertainment or informational value placed upon them by customers." SPA 26. The court also agreed that the government had to prove that Mr. Runner "contemplated or intended some harm to the property rights of the victim," SPA 14, and stated that Mr. Runner's "intent to cause cognizable harm is not readily apparent based upon the Indictment." SPA 24. However, the court ruled that it was "an impossible task [ ] to determine, in a pre-trial motion to dismiss, whether [the buyers'] ultimately received the benefit of the bargain by engaging in transactions…for intangible benefits." SPA 25.

The court asked: "what is the value of having psychic services provided by" a psychic? Are their "personalized services and objects" more "accurate, entertaining, magical or informational than other individuals"? SPA 28. It said that it had a "difficult time envisioning" Mr. Runner's company as fraudulent. *Id.* However, the court said that the jury should "decide issues of [Mr. Runner's] intent." SPA 31.

Trial

In opening, the government said that the customers "believed that they were receiving personalized letters, personalized services, and rare objects from a world-renown psychic. But they weren't, because there were no psychics." A. 50. The defense explained that the customers wanted an "experience of magic, of luck, of the unknown….[they] wanted astrological charms and talismans. That's what they got." A. 52. They "got the experience they paid for…[which] was rooted in make believe." A. 52. Mr. Runner had "every intention of giving customers the experience they were looking for when they were buying the astrological products…magic, luck, mystery." A. 52.

Prosecution Case

The mail-order astrology business

Mr. Runner ran a mail-order astrology business for about 20 years. Maria Thanos, the director of operations, and Philip Lett, another employee, testified about the business. A. 128, 131-33, 428. The business sent letters to customers that said they were from Maria Duval, a real person living in France, who had a "reputation as a psychic." A. 136. The letters included a picture of Duval, text designed to appear handwritten by Duval, and were signed with Duval's name. A. 137. These letters asked customers to, *inter alia*, buy books, audio recordings, statues, jewelry, seances, or "a connection with the psychic." A. 136, 462. The letters to each customer were the

8

same except for the customers' names. A. 173. Mr. Runner was in charge; he came up with the letters' concepts, wrote some letters, edited other letters from Duval's company, came up with business strategy, and supervised other employees. A. 137, 251. The director of the business was Martin Dettling, who did not testify; he set up the locations where customer mail would be received and filled out paperwork. A. 140, 194, 221.

Mr. Runner had a licensing agreement with Duval, which allowed his company to use her real name and picture, and sell her books and other writings. A. 136, 164, 221; GX 118A. Thanos met Duval in 1995 at the company's office; Duval and Mr. Runner met "all day." A. 158-59. Lett also met Duval, in 1996. A. 430. Thanos spoke to Duval on the phone "[m]ore than a dozen" times. A. 159. Thanos initially sent Duval customer letters, but stopped because Mr. Runner said that Duval "didn't want to receive them anymore because she had no room to store them." A. 169. The company paid Duval's companies 25% royalties on their sales. A. 136, 164. The business was for-profit; the goal was for everyone involved in the "Duval worldwide operation" to "make money." A. 135.

The government asked Thanos many questions about whether other "psychics" worked at the company. She said no. A. 137. Thanos didn't pay psychics to do "long and complex analysis," "trances," or prepare a "money release talisman." A. 173, 185-86. "No psychics" "review[ed]" customers' responses to the psychic promotions." A.

9

138. Unsurprisingly, people didn't get letters "because a psychic had a vision about them." A. 138.

At no point during the trial did the government attempt to define what makes a person a real psychic.

<u>Letters and products</u>

Each customer could be sent "up to 60" different letters or "promotions." A. 138. If the person continued to respond after 60 letters, the letters would repeat, which happened approximately every six months. A. 138. Each promotion cost the customer $5 to $45. A. 137. Lett, who helped set the cost of the products, was "trying to give them a good deal on the price." A. 526-27.

Thanos and Lett read many of the letters out loud. For example, one letter sold a ring, saying it was a "high quality gold-plated ring of Re for you ready to be sent to you for only $14." A. 170. The letter said that Duval "won't charge you anything…for the magnificent genuine one carat moonlight blue sapphire that has been set on your ring of Re." A. 170. It said that Duval had visited sapphire mines in Madagascar and brought back a "bag full of genuine midnight blue sapphires." A. 169. The rings came with a certificate saying they were sapphires. A. 189, GX 614. Although Thanos testified that she didn't "hire" a "master jeweler" to "prepare the certificate," A. 189, there was no testimony suggesting that the rings weren't sapphires and no one testified that the certificate wasn't genuine. Rather than ask about the authenticity of

10

the ring, the government elicited testimony that Duval didn't "really" "set" the ring. A. 503. Instead, Thanos ordered 1,000 of these rings from PartyMart for $2,810. A. 170. PartyMart advertised them as "Ring of Re with Genuine Sapphire." GX 134.

Another Duval letter read, "I can guarantee your ability to achieve great objectives," and "I can see you have already experienced good times during your life." A. 166. It said, "in the detailed astral-clairvoyant forecast I'm about to prepare for you…the combination of astrology and numerology with my psychic gifts enable me to make predictions …" A. 167-68. The letter asked for a photo to "enhance my psychic gifts about you each time I work on your case…I am going to be able to concentrate on my psychic strengths…my contact as a psychic can be with you permanently …" A. 168.

Another letter said that Duval had "experienced a flash," that

> revealed to me that you are currently facing many difficulties…with the action of the 7 great vibratory ceremonies that I'm going to preform for you…[d]estiny is going to transform your whole life … your worries are soon going to be nothing more than a bad memory. A. 173.

The letter said the person should send their "life dreams" and that after a "fumigation," the "smoke that carries off your wishes is going to reach the occult higher powers which in turn is going to charge one of the most magical and effective objects in making wishes a reality…" A. 174.

11

A letter selling a statue said that Duval met a "shaman," "healer, therapist, advisor and magician" in a "forgotten village," at the "edge of the world." A. 182. This magician gave her statues from an "ancient looking chest," that are "charged with [the magician's] positive vibrations," and will "reverse the [customer's] negative cycle." A. 182-83. The statue would "activate the universal laws that command wealth." A. 183.

A letter selling a vibrating crystal said that Duval had "received a mysterious package from Paraguay….and…found several vibratory crystals… on crystal number [X], the name [written on it] was Tina, your name." A. 202. The customer was told to put their hand on a paper and send it to Duval to "transfer their vibrations and energy." A. 203. The crystals were from PartyMart and made in China. A. 202. Thanos didn't arrange for "any psychic to initialize and program these" crystals. A. 203. The crystal came with a certificate of authenticity from a gemologist that it had "vibratory powers" that were "proven to be extremely positive." A. 201, GX 678.

Another letter offered,

> 2 free telepathic seances that can…grant you access to a power far superior to that which is available to a normal human, a power capable of ensuring that people are literally fascinated by you,… bring you a permanent Grand Protection against all negative forces,… [and] a new sense of inner serenity so that you always feel strong and confident. A. 463.

The customer had "untapped and dormant extraordinary gifts" and an "inner energy and strength that demands to be released." A. 463. The letter asked the person

12

to respond with specific times when Duval would "contact [them] telepathically." A. 464. Duval "promise[d] to diligently attend your telepathic seances." A. 464. This cost $30. A. 465.

Another letter stated that Duval was "preforming the protection ritual" "designed to send you as many positive waves as possible," and that she "hope[d] this magical action will work." A. 470. Another letter said:

> "I know that you are experiencing some difficulties in your life… I know your life is pretty miserable at the moment… believe me, I am very sympathetic to your distress….when I saw all these things happening in your life …I wanted to tell you about them right away, so that you don't lose faith," "a very bright future awaits you." A. 493.

This letter included another letter that said it was from another psychic, who "confirm[ed] [Duval's] clairvoyant flashes." A. 494. It said they "saw the same happiness and [ ] changes linked to you. There is absolutely no reason why everything that we are predicting for you couldn't come true." A. 494.

Thanos testified that the letters contained "lies." A. 137. The deceit the government focused on was the lack of magical properties in the objects and that a psychic didn't perform rituals. For example, people were sent lucky numbers generated by computer, not a psychic, based on the person's date and time of birth. A. 466. Booklets and readings people received were also computer-generated. A. 434-44.

Even Mr. Runner's wife communicated with Duval. A. 498. Just like all the other customers, his wife's response from Duval was created by a computer. A. 498.

13

<u>Customers ordered again and again.</u>

Nearly 50% of the business's customers bought more than once. A. 291; 529. Thanos believed this was "because they like[d] what they had received," and that 96-98 % of the customers were satisfied. A. 247, 328. Some customers wrote to explain "how Maria Duval's advice has helped them," and "how generally their luck had improved." A. 292. If someone wasn't satisfied for whatever reason, they got a refund. A. 328. In response to the government's question whether the "customers were satisfied or they just didn't know they were lied to," Thanos said they "were probably satisfied because they didn't know they were lied to." A. 332.

Lett testified that the company tried to keep customers satisfied, so they would buy again. A. 521. The company "tried to make sure the customers saw a value in what they bought." A. 521. Lett thought the buyers believed in astrology, were looking for entertainment, or mix of these two goals. A. 530.

The company used packaging that looked authentic to "increas[e] the perceived value of" the products. A. 281-82. As Lett explained, the right packaging would "heighten the value to the customer." A. 523. For example, Mr. Runner instructed his employees that the ring of Re be delivered in a pouch, without any made in China stickers, while the statue be wrapped in brown paper with string. A. 171, 184. Company emails showed them discussing how changing the PartyMart packaging and removing the "made in China" stickers "increase[d] the product cost," but also

14

"improve[d] the customer's first impression." A. 275. The original packaging "cheapen[ed] the perceived value of the item." A. 275, 522.

To find customers, the company ran ads in entertainment magazines, including TV guide, Soap Opera Digest, and the National Enquirer. A. 518, 533. The company also paid to send mailings to potential customers. A. 245. A marketing company provided lists of addresses of people interested in astrology, sweepstakes, and entertainment. A. 416-17, 420.

Generally astrology customers "tended to be from an older demographic," so the company targeted their ads and letters to people over 55 or over 65 years old. A. 408, 419, 534. At one point, the company considered expanding to an online market to attract a younger audience, but, after research, determined it wasn't the "right market." A. 420.

The mechanics of the mail-order business

Over the two decades that Thanos and Lett worked for Mr. Runner, the company changed names many times and had subsidiaries in different countries. A. 132, 141-42, 145-46. The business grew from about 5 people in the early 1990s to about 75 people around 2000. A. 147. In the beginning, Mr. Runner physically worked in the office "all the time." A. 156. Later, he came into the office for a few weeks a year, and otherwise worked remotely, from various countries. A. 141, 157. At some

15

point, the company "downsized," and "outsourced" work to "subcountract[ors]." A. 132.

Thanos explained that it was cheaper to incorporate in other countries and there were fewer tax consequences, A. 314, 331, and Mr. Runner had subsidiary companies registered in or with bank accounts in the United Kingdom, Liechtenstein, and Hong Kong, each under different names. A. 145-46

Customer mail was received at Nevada and Chicago commercial mail receiving addresses. A. 549-53. Nevada was a common place mail-order companies received mail, but the company also used Chicago, because Mr. Runner didn't want to "draw attention" to a large volume of mail. A. 193-94, 199. Mail was then forwarded to DMG, a New York company that opened the mail, took out the order forms and payments, recorded information, and prepared checks for deposit. A. 90-95, 140. DMG was instructed to discard letters that had no money. A. 193.

In 2014, postal agents seized letters addressed to Duval from the trash outside DMG. A. 94-95. This included envelopes that said: "once this envelope has been sealed…it may be opened only…by me," and signed Maria Duval. A. 98, GX 410. The front of these envelopes said to put a "photo or a few strands of hair from your head" in the envelope with your name and date of birth. A. 99. They also found what the agent called, "worthless trinkets," including crystals on chains, bracelets, and statues. A. 97.

16

Another subcontractor physically prepared the envelopes and packages with the letters, booklets, and other items bought by the customers and took them to the post office. A. 117-18. Postal inspectors took "statue[s] of the Goddess Lakshmi," baggies with "small gold colored ring[s]," and "vibratory crystal pendant[s]" from the mailing company. A. 120-22. The packaging said "made in China." A. 121-22.

If people didn't pay for a product they received, collection letters were sent, saying the company would take legal action if the person didn't pay. A. 476. The company never actually resorted to legal action. A. 480-41. The signature blocks on the collections letters used made up names. A. 477-80.

Thanos testified that there would be good months and bad months for the company's profits. A. 244. At one point, Mr. Runner made $120,000 per month. A. 223, 329. In asking for more money, Mr. Runner explained that he was late on payments to his kids' school and payments for another business he ran, a leather goods store. A. 225-26, 252-53.

<u>Negative publicity and regulatory risks</u>

In 2007 there was "negative publicity" about Duval online. A. 214-15. Pacnet, a payment processing company, referred Thanos to a blog, calling Duval a "scam," and told her the bank had brought the "scam alert pages" to a "compliance meeting." A. 215. Pacnet explained that, "while Maria Duval has many admirers, her detractors on the internet have created considerable negative press," which is "affecting our bank

17

relationships." A. 217. A Canadian bank stopped taking checks payable to "Maria Duval," and Pacnet became concerned about being "penalized with higher fees, or worse, termination of service." A. 216-17. The company changed their order forms so people made checks out to the company, instead of Duval. A. 218.

Mr. Runner was concerned about the company's "[r]egulatory risk" causing their mail to get "seized." A. 199-201. Thus, he edited the language of some letters, including to make them less concrete, for example changing "you will win," to "I see you winning." A. 540-42. In an email, Mr. Runner noted that a particular letter was a "pretty dangerous promotion," so he had "tone[d] [it] down…at many places." A. 200. Mr. Runner called letters that were riskier to regulation "hot" and made edits so they were less "hot," or less risky. A. 542-43. Mr. Runner didn't use the word "hot" to refer to the psychic promotions generally; all the promotions were about psychics. A. 286

After the company received an inquiry from the Nevada Attorney General's office, they stopped mailing to Nevada because of concerns the mail would be "seize[d]." A. 236-37. The company applied for a new mailing address in Arizona, under a new name. A. 238, 553. Right afterward, the "Department of Justice put a stop to the mailings." A. 239.

Thanos claimed that Mr. Runner told her "not to retain any documents" "with his handwriting." A. 177. Nonetheless, the government introduced exhibits with his

handwriting, including his edits to letters. A. 180. Thanos also claimed that Runner "didn't want his name on any of the companies or accounts." A. 141. For "a period," Mr. Runner used the name "Billy Rod," because it was a "cool name." A. 178. Later, however, she claimed he used that name because he "didn't want his name associated" with a particular promotion, unrelated to Duval, from the late 1990s. A. 179; GX 141. At one point, Pacnet asked Thanos to fill out information to comply with "anti-money laundering requirements," and she used Dettling's name. A. 211-13.

Lett, Thanos, and <u>Daniel Arnold</u>, who provided the mailing lists, each testified that they pleaded guilty to conspiracy to commit mail fraud. A. 134, 401, 434. Arnold believed he was guilty because he worked "as a list broker." A. 401. He pleaded guilty because he was scared and was told it would cost a million dollars to defend himself. A. 401. Lett believed he was guilty because he sent "deceptive mailings" for money in "exchange for cheap trinkets and computer-generated readings and booklets." A. 434-45. Thanos believed she was guilty because the "mailings were deceptive" in that they "weren't coming from Maria Duval." A. 134.

None of the cooperating witnesses testified they had an intent to harm any customers.

19

2004 administrative action

In 2004, postal inspectors seized mail from Mr. Runner's company and filed an administrative complaint. A. 204. A person named Balbino Alvarez declared that he was the director of the company and that Mr. Runner "does not own any equity interest" in it and was "not involved." A. 208. The complaint listed what the postal service "believe[d]" were "false representations," including that the recipient was "specifically selected to receive the mailing" "based on a reason other than the fact that the person's name appears on a mailing list"; that they are "aware of specific information about the recipient and will directly impact on the person's well-being"; and that responding will "improve their personal security" and provide "a financial benefit." A. 344-45. [2] The administrative complaint ended with a settlement and, afterward, Mr. Runner changed initial mailings from the company to make them "less personal." A. 209.

Customers were looking for "hope"

Five customers testified, saying that that they were "spiritual" and had been looking for "hope" when they responded to the letters from Mr. Runner's company. When Ingrid Wolf responded to the letters, she was "looking for hope and peace" and "trusted" Duval. A. 264. The letters gave her "hope." A. 265. When asked if she was "satisfied with [her] purchases," she replied that she was "surprised at some of

---

[2] The court had previously overruled the defense objection that this administrative action was overly prejudicial because it related to false representations without any intent to harm. Dkt. 56.

the purchases, but I took them. I was hoping. That's all I did was hope." A. 265-66. She added again that she was looking for "hope," "peace," and "help." A. 271.

She testified that she started receiving letters from Duval during a "very hard time," saying that her husband was diagnosed with cancer, and was sick for 9 ½ years. A. 264. She claimed that she replied because she was "scared when [her] husband got the diagnosis," and "I thought [Duval] would…give me hope, and tell me the truth." A. 265. She bought the products from 2009 through 2014, but her husband died in 2006. A. 267, 272. In reality, therefore, she did not respond to the letters when her "husband got the diagnosis"; her husband had died three years before she started receiving letters. Counsel objected before her testimony, arguing she shouldn't be permitted to testify to inaccurate facts, but the court overruled the objection, allowing the false, sympathetic testimony. A. 260-61.

Keith Aldrich was also "looking for hope," and "some answers." A. 368. In 2007, he started receiving Duval letters, including letters saying that she would "perform [her] grand moon influence ritual" and that she would "place all [her] occult powers at [his] service." A. 365-66. He stopped responding after he was in a motorcycle accident, but then began responding again. A. 366. He hoped the products would lead to him "getting use of [his] arm back" or bring him "good luck." A. 374. He explained, "it wasn't about the money [but] getting my family back." A. 374.

21

Barbara Callahan testified that Duval would "send me cards," "little gadgets," and a statue. A. 394. The items were "just gadgets," but were also "okay." A. 394. She bought the items because Duval was "offering [ ] a million dollars." A. 394. She didn't think Duval was receiving the money Callahan paid. A. 394. Eventually, realizing she had started to receive duplicate letters, she wrote to Duval saying Duval keeps "sending the same letter and thinking that [I] won't know." A. 394-95. Callahan's letter said, "[t]his world is in a big enough mess as it is, and then people like you come along, and give us hope." A. 395. She concluded by saying "thanks for nothing." A. 395.

Laura Carissimi testified that she closed her mother's bank account when she realized her mother was responding to the Duval letters. A. 379-80. Three of her mother's checks to Duval didn't clear, and she received collection notices. A. 379-80. Carissimi returned the items her mother had purchased, including "pamphlets," a "talisman," a necklace, a CD, a "booklet of phrases," "astro symbols from ancient religions," and other "things like that." A. 389. She "wanted the account to be closed," and "thought it only fair that merchandise … be returned." A. 390. After she sent back the items, she received a refund check. A. 388.

Farida Beharry and Kathleen Ervin testified similarly to the other customers. Beharry said that, when she received Duval's letters, she "was hoping" that the products would bring "peace." A. 59-61. She thought the rituals would "help." A. 61.

The "vibratory crystal" she bought, however, didn't "vibrate" when she held it "towards the moonlight." A. 63. Nonetheless, Mr. Runner's company caused her "no financial hardship." A. 70. Ervin "believe[d] in" "psychics" and was "hoping that [Duval] could help me to figure out where I was headed." A. 77. She was the only customer to testify that she wasn't "satisfied" with an item she received, saying that she didn't think she received a "real moonstone." A. 79. Afterward, however, she kept purchasing. A. 86-87.

Over objection, the government was permitted to introduce letters from the company's trash from people in sad situations. One person wrote:

> Dear Maria, My luck has gotten worse. Now my son has something on his kidneys…but [he] has the same problem I have, no money. I am scared. My nerves are shot. My hands shake all the time. If you could send me the numbers I need. When I win I'll pay you back…Please be kind. Send me my money back and I'll go back to being miserable. I'm sorry. But I have no hope. With love, your friend Steve. A. 585; GX 412.

Another letter in the trash said: "Dear Maria, I'm sorry for not responding. I have no money to give you. As soon as I will I'll be sending you whatever I owe you. Thanks for helping. I love you my friend." A. 586; GX 463. It continued, "My life hasn't changed. I am broke and don't have the money you need. It's not that I don't believe you. I don't have any money left…" A. 586.

The jury ultimately convicted Mr. Runner of fraud related to Wolf, Aldrich, and Callahan, but acquitted him of the counts related to Beharry and Ervin. The other

individual mail fraud counts related to customers who didn't testify. For the counts related to Wayne Gilbert and Bill Spitler, the government only introduced charts listing their purchases. GX 500, 512. For Barbara Daniels, Shirley Wright, and Martha Smith, the government introduced one letter they each received. GX 540, 549, 565. The jury convicted Mr. Runner of mail fraud related to these non-testifying people. The government introduced extremely similar evidence related to two other individuals, who didn't testify, introducing one letter Manuel Sousa had received, and a list of Jerome DiMarco's purchases. GX 508, 559. The jury acquitted Mr. Runner of the counts related to Sousa and DiMarco.

Defense Case

Professor David Gal, a marketing expert and professor at the University of Illinois, Chicago, testified that customers value products or services either for something that is "utilitarian' with "practical benefits," and "objective" value, or for a "hedonic-type product or service," where the value is more "subjective and it's more about experience." A. 603-04. Video games, movies, live performances, and magicians are of the hedonic-type. A. 604. Some things have both aspects, like food, which has practical benefits but also people "gain enjoyment and enjoy the experience of eating." A. 604.

He explained that there is a "body of research" supporting that customers value some products for the experience. A. 604. For example, people value the "ability to

indulge in fantasy" in video games. A. 604. Another example was that sales dropped when J.C. Penney switched from "constantly [having] sales" to saying they had "everyday low prices." A. 605. It turned out that people liked the "feeling of fun, the feeling of … getting a deal" from sales. A. 605. The New York Times headline describing this said, "Sometimes we want prices to fool us." A. 605.

He provided examples of other items sold for the hedonic value: a dream catcher, which "allows the customer to indulge in their imagination and enjoy the feeling of maybe they'll get good luck or good dreams"; a Ouija board, a mass-produced game, that people play to "indulg[e] in the experience" of "fortune telling"; and Goop's $550 healing crystal necklaces, which the wellness company said "amplify the wearer's energy and intent." A. 607-10.

A large disclaimer on hedonic products saying they had no "healing qualities" and were only for "entertainment" would "shatter the[ir] value." A. 610. People are looking to these products to "suspend disbelief"; the "value is indulging in the fantasy" and a disclaimer would "destroy[ ] the fantasy." A. 610.

Similarly, in Mr. Runner's astrology business, the value was the "subjective experience of imagination." A. 611. The "value of psychic services" is "indulging in the fantasy that you are going to experience…some luck." A. 644. Gal asked, is there "a real psychic with real psychic abilities? People get value from indulging in the imagination of…why not"? A. 645.

25

Using customer lists based on demographics is also common. A. 627-28. People over 65 are "treated like any other demographic group, "capable of making rational consumer decisions." A. 627-28. Older customers are "not more susceptible" to sales pitches, as they generally have "a lot of experience" "in people trying to persuade them to buy stuff." A. 628.

Gal explained that companies try to avoid regulatory scrutiny, which takes up "time and money that you'd rather devote to growing your business." A. 627. Refund guarantees are also "extremely common" in the mail-order industry because they "reduce[ ] the risk to the customer, which makes them more likely to buy." A. 616.

Gal testified that repeat purchases are an "indicator of product satisfaction" and that it is a "general rule that repeat customers are satisfied customers." A. 613-14. Mr. Runner's company had a "very high repurchase rate," indicating customers had a "positive experience and were satisfied." A. 616. Gal "couldn't identify alternative explanations" for Mr. Runner's high rate of repeat customers. A. 616.

Motion to dismiss

The defense moved to dismiss, arguing the evidence was insufficient for each count and specifically arguing that there was insufficient evidence that Mr. Runner intended to harm his customers. A. 589-90. The "worth of the psychic goods and services offered by [Mr. Runner]…is derivative of…the entertainment or

26

informational value placed upon them by customers." A. 590. The customers "considered their experience" and "bought again." A. 590-951.

The government said that "[l]ying to [customers] to take their money is the harm…there doesn't need to be some additional harm contemplated." A. 591. The fraud was that there were "no psychics." A. 591. The products were "represented to be unique and valuable" and "had certificates of authenticity and other indicia of having certain qualities," but were "cheap trinkets." A. 591. The "products" were "fraudulent" because the letters "misrepresented" "who was sending them," "where they came from, and the characteristics." A. 591.

The court said that it liked "horoscope[s]" because they are "entertaining." A. 592. The government said that this is "very different than a horoscope" because it is "more fraudulent and the steps taken to lie to the victims, to attempt to back up those lies…over time…" A. 592. The defense said the "horoscope analogy is a good one," as, under the government's theory, if the horoscopes were generated by a computer program, that would be a criminal enterprise. A. A. 592-93. Here, as with horoscopes, people weren't harmed by paying for astrological services that allow them to be "entertained and believe." A. 593.

The court denied the motion, saying "I think there is sufficient theory. The law hopefully will be presented in a clear way so the jury understands [ ] the need for this intent to harm." A. 593.

27

<u>Charge conference, summations, jury instructions, and verdict.</u>

Pretrial, the defense requested the jury charge explain the element of intent to harm, including that if customers received the benefit of their bargain, there was no fraud, and that causing customers to enter into transactions they would otherwise avoid isn't sufficient. Dkt. 83 at 40-42. During the charge conference, the defense again requested that the jury be charged on this element. A. 657 (proposing, *inter alia*, that "To establish fraudulent intent, the government must demonstrate some harm contemplated to the victim of the fraud that goes to the nature of the bargain itself"); 658 (requesting language about the "benefit of the bargain" and that the jury should "evaluate the element of materiality from the perspective of … whether [the customers] were harmed or not harmed"). The defense also requested the charge: "If you are persuaded beyond a reasonable doubt that the customers were deceived, but you nonetheless conclude that the customers received the benefit of their bargaining, the government has failed to sustain its burden of proof on this element." A. 659-60.

The defense explained that the intent to harm should be stated in "words that are helpful to the jury," so it could "separate [the] concepts" of deceit and harm." A. 661. This charge was "critical" "where there's been [ ] evidence of deceit, but…no competent evidence of intent to harm." A. 661. Counsel noted that this "distinction" "goes directly to the defense theory." A. 661. The government responded that an

"additional free-floating concept of intent to harm on top of lying to someone in a material way to take their money is not required." A. 662.

After lengthy discussion, the court said "I'm going to keep" the intent to harm language. A. 664. The next day, however, the court removed the paragraph stating that "an intent to harm a party to a transaction cannot be found where the government's evidence merely indicates that the services contracted for were dishonestly completed. Similarly, the government does not establish an intent to defraud merely by showing that the defendant caused customers to enter into transactions that they would otherwise avoid." A. 670. Counsel reiterated his objection. A. 671.

Directly after this ruling, summations began. A. 673. The defense summation focused on the difference between deceit and fraud, that no customers were harmed, and that Mr. Runner had no intent to harm. A. 696-719. Mr. Runner's business selling magic, crystals, and astrology involved deception, but customers weren't "harmed" and no one "intended" harm. A. 696. The defense, *inter alia*, explained that the judge would tell the jury that the government had to prove that Mr. Runner "made material statements in order to harm customers," which was "crucial." A. 695. The defense argued the customers were adults, who had the right to buy astrological experiences. A. 716.

29

In rebuttal, the government asserted it was "not required to prove harm…[and] that man intended to lie to people, to steal their money." A. 719. It told the jury, "[y]ou don't have to decide whether a victim was harmed. You don't have to decide whether a victim was entertained. That is not relevant." A. 719. The jury just had to "to understand" that Mr. Runner "took advantage of people's spiritual beliefs, and he lied to them, and he took their money…that's fraud." A. 719. It said that if Duval "was doing the worse séance ever done by a psychic, the shortest clairvoyant sessions were performed at the lowest quality, we would not be here. You don't have to believe that psychics are real. You just have to know that he lied about it. That's all." A. 720. The prosecutor accused the defense of treating "psychics and … people who believe in psychics like a joke…," saying "[l]et us dispense with the notion that the law permits that….We may think other people are foolish for what they believe…What's not okay is taking advantage of people because of what they belief…." A. 717. The government asserted that the "law does not permit" Mr. Runner to "lie to sincere, well-meaning people … for money." A. 718. Getting money was "sufficient harm." A. 719.

The jury charge didn't explain that intent to harm was an element. The phrase "intent to harm" didn't appear. Instead, it stated that the

> [i]ntent to defraud means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another. As such, it is not enough for the government to show only that the defendant intended to deceive

30

the victim. Whether a person acted knowingly and with intent to defraud is a question for you to determine. This question involves one's state of mind. A. 744.

The only time the word "harm" appeared was almost as an aside:

> Also, if you find that a fraudulent scheme existed, it is no defense that the government – it is no defense that the customer fell prey to the fraudulent scheme because he or she failed to act vigilantly. The crucial question is whether the defendant was involved in the scheme where he made material false statements or failed to disclose material information, and did so in order to harm customers. Whether or not a particular customer acted foolishly is irrelevant. A. 745.

The court then said that, "[a]s a practical matter, …the government must prove … that he knew that his conduct…in the scheme was calculated to deceive and…he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another." A. 745.

The jury returned a mixed verdict, acquitting Mr. Runner of four counts, relating to Beharry, Ervin, Sousa, and DiMarco, and convicting him of the other 14 counts.

Post-verdict motion to dismiss

The defense again moved to dismiss because of the lack of evidence of intent to harm. Dkt. 109. In response, the government still made no argument as to what evidence proved Mr. Runner's intent to harm, but repeated that it was sufficient that Mr. Runner "lied to" people and "took their money." Dkt. 110 at 32.

The court found there was sufficient evidence for the jury to "infer" an "intent to defraud," SPA 171, pointing to testimony about the "operations' efforts to conceal, the quality and origin of the astrological products sold." SPA 176-77. It was the "role of the jury to resolve" whether Mr. Runner "possessed the requisite intent to harm" by removing the "Made in China" markings. *Id.* The court said there was evidence he "misrepresented the material characteristics of the astrological products," which were from PartyMart, rather than from Madagascar or Paraguay, adding that there were no arrangements for a "psychic[ ] [to] program the crystals." SPA 177-78. Regardless of "whether the psychic products had hedonic/experiential value…as described [the objects] would also have had objective value of which customers were deprived." SPA 178-79, citing *United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019).

The court found that offering "psychic services with the intention of never providing them was relevant to determining his intent to harm," because customers testified that they bought the promotions because they "believed the psychic services and/or products could help them in their lives." SPA 180. The court said it was "irrelevant whether the astrological products or the psychic services, if performed, would have worked." SPA 181-82, citing, *inter alia*, *United States v. Stevens*, 2022 WL 2704522 (S.D. Fla. May 2, 2022).

32

Objection to the guidelines loss amount

The presentence report assessed a loss amount above $150,000,000, adding 26 levels, under U.S.S.G. §2B1.1(b)(1)(N), to a base offense level of 7. PSR 12. After adding additional levels for the number of victims, violating an administrative order, using sophisticated means, having vulnerable victims, and being a leader, the total offense level was above the highest level. PSR 12. Mr. Runner's criminal history score was zero, but his guideline range was 3,360 months. PSR 12-14, Addendum. The court adopted this range. A. 823-24.

The defense objected to the loss calculation, arguing it was "premised on the notion that every single customer…was defrauded. A. 787. Even among the customers the government chose to highlight at trial, the acquittals showed that four of them "experienced no loss." A. 799. The defense also pointed to government questionnaires sent to Mr. Runner's customers that stated that the customers experienced no hardship, or had a positive experience. Dkt. 119. For example, when asking what financial, personal impact, or hardship the customer faced, one person wrote, "none:"



4) What was the financial or personal impact or hardship to you of paying money to Ms. Duval or Mr. Guerin?

NONE

Another customer wrote they were "100% satisfied," adding that the person would "highly recommend." *Id.* Another explained that they still had "some trinket amulets + medallions tarot cards I would rather not part with yet." *Id.* Another person wrote,

4) What was the financial or personal impact or hardship to you of paying money to Ms. Duval or Mr. Guerin?

_No hardship, just entertainment_

Dkt. 122-15.

Counsel noted that the 12 examples it included in its sentencing submission were just a "tiny subset." Dkt. 119. The court needed to do a "reasonable extrapolation" based on that for loss. A. 799.

Counsel also argued that, even the customers who felt harmed by Mr. Runner's company felt emotional, not financial harm. A. 789. They "believed in the astrology…and then were ashamed and upset and in pain to find out it didn't come true." A. 789.

The government argued that the loss amount was the total company revenue for 15 years; saying that a "conservative estimate" was $175 million. A. 793-94. It said that people's reported satisfaction was irrelevant because they didn't know that Duval wasn't writing to them. A. 794. In the government's view, unbeknownst to the customers, the "whole fraud was impacting them," even while they felt satisfied. A. 795.

The court "agree[d] with the government," adding "this is an unusual case and the appeals process may prove me to be wrong," but the government has "set forth

34

just on the mechanical analysis of the volume of the mail [and] the monies that were calculated" [stet]. A. 801. The court added that the guidelines took out the money related to the acquitted counts, but then realized that wasn't correct. A. 802. The government said it didn't matter because, even subtracting those four customers, the amount would be above $150,000,000. A. 802. Later, the court noted that there were "satisfied customers. But they're still defrauded." A. 821. The court said, "This man stole $175 million, supposedly. We'll determine on appeal whether or not that's s[us]tainable." A. 822.

At sentencing, the daughter of a customer said that her mother "suffered [a] great emotional impact." A. 782. Mr. Runner explained to the court that, during the trial, he "realized all of this human misery that [he] didn't perceive for so many years because [he] was so disconnected from my customers." A. 818. Watching the customers testify, he felt "heartbroken." A. 818.

The court said that the "victim's weren't hurt as much as other victims," there was "a glimmer of some type of fortune telling," and Mr. Runner's company didn't work in "a particularly nasty way." A. 785. But, the court said that it was a "straight out fraud in that there's no fortune telling" and that the "length of the fraud [ ] makes it so serious." A. 785, 811. The court sentenced him to 10 years' imprisonment and three years' supervised release. A. 823.

## Summary of Argument

Magic isn't real, people can't see into the future, and objects won't bring you good luck. But, people are free to believe in magic, psychics, and the supernatural; they are free to indulge in the fantasy that a crystal will bring them peace; they are allowed to hope that some numbers are luckier than others; they can believe that telepathy will improve their lives. Companies are allowed to sell astrological products; they can sell horoscopes, fortune-telling, and lucky numbers; they can sell the experience of believing a séance or a crystal will change their customers' fortunes. Selling astrological products that aren't actually supernatural isn't criminal fraud.[3] But that was the basis of Mr. Runner's conviction.

The indictment alleged that Mr. Runner's astrological business was fraudulent because no psychic had visions, performed telepathy, or personally wrote letters, and because the objects sold were not unique and supernatural. It short, it alleged the astrological magic wasn't real. It didn't allege any intent to harm any customers. That customers didn't receive real, personalized, psychic magic was not a harm to property.

The evidence at trial suffered the same deficiencies. The testimony further supported that Mr. Runner intended no harm: his company tried to improve their customers' experiences; employees thought customers were satisfied; and the

---

[3] Although the argument here focuses on fraud, it also applies to Mr. Runner's money laundering conviction, which depended entirely on the allegation that his business was fraudulent.

testifying customers said they engaged with the company in an intangible search for hope and answers. Any harm was emotional or spiritual and based on the intangible blow to the customers' belief in astrological mystery. That wasn't criminal fraud.

Moreover, although the court recognized the element of "intent to harm" as the crux of the case, at the last moment, and over objection, it removed the jury instructions about this element. This was prejudicial error.

Finally, at sentencing, the court recognized some customers were satisfied, but, nonetheless, counted the entire business's revenue as guidelines loss. This too was error.

Argument

Point I

**The indictment against Mr. Runner alleged that he committed fraud because his astrology company did not provide the real, personalized psychic magic it promised. The indictment was legally insufficient because it failed to allege that Mr. Runner had any intent to harm a property interest.**

A.    Standard of Review

A defendant is "entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000). When "one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *Id.* at 93. The sufficiency of the indictment are matters of law that are reviewed <u>de novo</u>. *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012).

B.    The essential elements of fraud.

The wire and mail fraud statutes penalize using wires and mail to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341 & 1343. The "essential elements" are "(1) a scheme to defraud, (2) money or property as the object

38

of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016).

To prove a "scheme to defraud," the government must also prove the defendant had a fraudulent intent. *Novak*, 443 F.3d at 156 (quoting *Starr*, 816 F.2d at 98 ("Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent)). *See also United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (fraudulent intent means the "defendant's conduct was calculated to deceive") (cleaned up). "[F]raudulent intent cannot be inferred from evidence at least as consistent with innocence as with guilt." *United States v. D'Amato*, 39 F.3d 1249, 1259–60 (2d Cir. 1994) (citation omitted).

To prove fraudulent intent, the government must also prove the defendant had the intent to harm. "Intent to deceive alone is insufficient to sustain a wire fraud conviction, misrepresentations amounting only to a deceit ... must be coupled with a contemplated harm to the victim." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). (cleaned up). *Accord Starr*, 816 F.2d at 98 ("Misrepresentations amounting only to a deceit are insufficient…; the deceit must be coupled with a contemplated harm to the victim"). Thus, the government must show "that some actual harm or injury was contemplated by the schemer." *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996) (citation omitted). *See also Novak,* 443 F.3d at 156 (same).

39

In addition to proving fraudulent intent, the government must also prove "that the misrepresentations were material." *Weaver*, 860 F.3d at 94. Fraudulent intent and materiality are often connected, but they are different requirements. *Id.* at 95. Materiality means that the "information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).

If the alleged victim receives the benefit of their bargain, despite deceit, there is no scheme to defraud. For example, in *Starr*, defendants said they would "pay for …postage fees," but instead kept money for "their own use," and caused "fraudulent postal receipt forms to be sent" to "avoid detection." 816 F.2d at 99. As this Court wrote, "[c]learly…[the] customers were deceived." *Id.* There was, however, no intended harm. On the contrary, the customers were "satisfied" and received a "timely shipment and handling" of their mail, which was the bargain they paid for. *Id.* This Court dismissed the indictment. *Id.*

Similarly, in *Regent*, the company's salesmen lied to customers to induce them to buy stationery. These lies included telling customers that the salesman had been "referred to the customer by a friend of the customer," that the salesman was a "doctor," or that the owner of the stationery had died and the customer would "help to relieve this difficult situation" by purchasing. *Regent*, 421 F.2d at 1176. This Court

found that these lies were deceitful, but again found that no "actual harm or injury" was contemplated. *Id.* at 1180. As in *Starr*, the customers received what they paid for.

In *Shellef*, this Court again reversed a fraud conviction when the defendant "induced" a company to sell a chemical that it "would not have sold had it known that [the defendant] intended to sell [the chemical] domestically." 507 F.3d at 107.. 507 F.3d at 109. The indictment didn't allege "discrepancy between the benefits reasonably anticipated and the actual benefits received," so there was no allegation that the defendants "contemplated actual harm." *Id.* This Court explained that

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid-which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.

*Id.* at 107–08.

The *Shellef* indictment was legally insufficient because it only alleged that the person "enter[ed] into a transaction it would otherwise have avoided." *Id.* at 109.

    i.    The intended harm must be connected to property.

The intended harm must also be connected to property. Recently, in *Ciminelli*, the Supreme Court strongly criticized any interpretation of fraud extending to "intangible interests." *Ciminelli v. United States*, 598 U.S. 306 (2023). The Supreme

Court has "consistently rejected such federal fraud theories that stray from traditional concepts of property." *Id.* at 314–15 (cleaned up).

The reasoning of *Ciminelli* abrogated *Binday*, in which this Court found that a lie about the type of insurance sold was "essential" because the "insurers held [the] expectation" that the type of policy mattered economically. 804 F.3d 558. In the now-abrogated decision, this Court found that the harm was the "unbargained-for risk of economic loss," reasoning that it was sufficient that the lie impacted "economic decision-making" because the insurers "believed" the types of policies were economically different, even if, in reality, they were not different. *Id.* at 574. *Ciminelli*, however, repudiated the idea that "mere information" could be "the protected interest" under § 1343. 598 U.S. at 315. An intangible harm based on the buyers' belief isn't enough.

Moreover, the harm to "property must play more than some bit part in a scheme: It must be an object of the fraud;" a "fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly v. United States*, 590 U.S. 391, 402 (2020) (reducing number of traffic lanes on bridge for political reasons wasn't wire fraud, even though the scheme also involved money, including hiring extra toll collectors). [4] The mere fact that someone paid money isn't

---

[4] The Supreme Court recently granted certiorari in a case that rejected the argument that buyers received the benefit of the bargain when they contracted to fix roads, but falsely certified that they

automatically a harm to property. *United States v. Milheiser*, 98 F.4th 935, 945 (9th Cir. 2024) (finding it legally insufficient "that a defendant ma[d]e a false statement that would be expected to and did cause someone to turn over money").

C.    Mr. Runner's indictment didn't allege an intent to harm tangible property.

The indictment alleged that the psychic magic Mr. Runner sold wasn't real. People were "induced" by deceit to buy purportedly "personalized astrological services" or "supposedly unique and supernatural objects," but a psychic didn't have visions or use "psychic power," the letters "were mass-produced" and "not from psychics," and the items were not "unique and supernatural." A. 21-23. The indictment stated that the "object and purpose of the scheme was to obtain money from the Victims by means of [the] false and fraudulent statements and material concealments of fact in the letters." A. 23. Contemplated harm is simply not mentioned in the indictment against Mr. Runner.

"[I]induc[ing]" to buy through deceit doesn't show intent to harm. *Shellef,* 507 F.3d at 109; *Starr*, 816 F.2d at 98; *Regent*, 421 F.2d at 1180. The indictment alleged that the "purpose of the scheme was to obtain money" through false statements. But this Court has also repeatedly explained that deceit without contemplated harm is

---

would use particular businesses. *United States v. Kousisis*, 82 F.4th 230 (3d Cir. 2023), *cert. granted*, No. 23-909 (June 17, 2024).

insufficient. *E.g., Shellef,* 507 F.3d at 109; *Novak,* 443 F.3d at 156; *Starr,* 816 F.2d at 98. Nothing else in the indictment alleged an intent to harm. The court's ruling admitted as much, saying that the "intent to cause cognizable harm is not readily apparent based upon the Indictment." SPA 24.

Moreover, any possible harm alleged in the indictment was intangible. As alleged, the customers received letters and items, but – contrary to what they were told – the person writing the letters didn't have psychic visions about the customer and the items weren't magical. A failure to provide actual magic, "real" psychic readings, or "supernatural" objects is quite far from the "traditional concepts of property." *See Ciminelli,* 598 U.S. at 314–15.

Under the First Amendment, people are free to believe in magic, the supernatural, or psychic powers and companies are free to sell things that allow people to indulge in those beliefs. U.S. Const., amend. I; *Argello,* 143 F.3d at 1153 ("Citizens are at liberty to believe that the earth is flat, that magic is real, and that some people are prophets"; the "speech itself is what [client] is paying for"); *Adams v. Alexandria,* 878 F. Supp. 2d 685, 690 (W.D. La. 2012) ("engaging a fortune-teller could be just for fun—a novelty and a form of entertainment like casino gambling or trying to throw the softball through the rings to win the big bear on the top shelf at the fair"); *Nefedro v. Montgomery,* 996 A.2d 850, 858 (Md. App. Ct. 2010) ("[F]ortunetellers, like magicians or horoscope writers, are able to provide entertainment to their

44

customers or some other benefit that does not deceive those who receive their speech."); *Vill. of Schaumburg v. Petke*, 373 N.E.2d 716, 718 (Ill. App. 3d 1978) ("Many people seek out card readings, fortune tellings, palmistry, astrology readings or horoscopes for amusement or entertainment, as a lark, out of curiosity, or to satisfy their superstitious beliefs."). But any harm from learning that a letter or object wasn't actually produced by a person who could see the future is intangible. That Mr. Runner's company didn't deliver magic as promised is simply not the type of harm the fraud statute criminalizes.

The court's ruling to the contrary relied on *Binday*, 804 F.3d at 578, since abrogated by *Ciminelli*, 598 U.S. 306. SPA 21. Citing *Binday*, it said that this Court had "upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement." In line with *Binday*, the court stated that it needed factfinding to "estimate" the difference "between the benefits provided to customers through personalized astrological goods and services provided by world-renowned psychics versus run-of-the mill mass-produced readings and trinkets from allegedly nonpsychic beings." SPA 25.

*Ciminelli*, however, repudiated the idea that "mere information" was a "protected interest" under § 1343. *See* 598 U.S. at 315. The difference between goods from psychics and the same goods from not-psychics isn't a protected property interest. By the same token, any intangible harm to the customers from receiving fake

45

magic isn't a protected property interest. Any harm was to the customers' beliefs: they could no longer believe that the objects they purchased were magic. That harm isn't fraud because it isn't a property interest.

Instead, the government's theory that Mr. Runner committed fraud because there were no psychics – a term the government did not define – and no supernatural objects is legally insufficient. Accordingly, this Court should vacate Mr. Runner's conviction and dismiss the indictment. *See Aleynikov*, 676 F.3d 71; *Shellef*, 507 F.3d at 109; *Starr*, 816 F.2d at 101.

## Point II

**The trial evidence was similarly insufficient because it did not prove that Mr. Runner intended to harm his customers, who valued his products, and any possible harm was to intangible beliefs in psychics, magic, and hope.**

A.            <u>Standard of review</u>

This Court reviews challenges to the sufficiency of the evidence <u>de novo</u>. *United States v. Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997). "A defendant challenging the sufficiency of the evidence bears a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). This Court must enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager"

46

that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). *See Jackson v. Virginia*, 443 U.S. 307 (1979).

Nonetheless, Mr. Runner's burden is "not an impossible one." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004). If the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). The "jury's inferences must be reasonably based on evidence presented at trial, not on speculation," and "specious inferences are not indulged." *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (cleaned up).

B.      The evidence was insufficient to show that Mr. Runner had the intent to harm any tangible property interest.

The government's theory at trial suffered the same insufficiency as at the indictment stage. At trial, it introduced extensive evidence that Mr. Runner's company didn't have real psychics, actually supernatural objects, or magical lucky numbers. But, it made no attempt to show Mr. Runner had an intent to harm or that any harm was connected to a property interest. Instead, the trial evidence only further illustrated that any harm to the customers was intangible and that the company believed its

47

customers were satisfied. This evidence showed deceit, but not intent to harm. It showed lies, but not any harm to property.

> i.     The customers received the intangibl value they sought.

The customers themselves testified that they engaged with Mr. Runner's company for an intangible benefit: "hope." A. 264 (Wolf was "looking for hope and peace"); 368 (Aldrich was "looking for hope" and "answers"); 61 (Beharry was "hoping" for "peace"); 77 (Ervin was hoping to "figure out where [she] was headed"). These customers received messages of hope; the letters explained that their "worries are soon going to be nothing more than a bad memory," A. 173, that the objects would give "positive vibrations," and "reverse [a] negative cycle," A. 182-83, and that the customers had a "bright future" and "an inner energy and strength."[5] A. 463, 493. These customers saved the objects they received and kept ordering them. As Callahan testified, she knew the items were "gadgets," but they were "okay." A. 394. As Beharry testified, the company caused "no financial" harm. A. 70.

---

[5] Feeling hopeful, having a positive outlook, and believing that you are lucky can have real benefits for mental health and well-being. *See* Kubzansky LD, et al, "Optimism and risk of incident hypertension: a target for primordial prevention," Epidemiol Psychiatr Sci. 2020 Aug 14 (concluding that "higher optimism levels were associated with reduced hypertension risk independently of sociodemographic and health factors"); Laranjeira C, Querido A., "Hope and Optimism as an Opportunity to Improve the 'Positive Mental Health' Demand." Front Psychol. 2022 Feb 24 ("There is empirical evidence supporting the notion that both [optimistic and hopeful] attitudes contribute to positive [mental health] outcomes"); Johns Hopkins Medicine, "The Power of Positive Thinking," available at, https://www.hopkinsmedicine.org/health/wellness-and-prevention/the-power-of-positive-thinking (reporting that people with a "positive outlook" were 1/3 less likely to have a heart attack than those with a "more negative outlook").

The defense expert explained the customers' experiences in marketing terms: products that people value for the experience and intangible benefits are called "hedonic." A. 604. Their value is subjective. A. 604. People like indulging in the "experience" of believing in "healing qualities" and have enjoyment through the "feeling of maybe they'll get good luck." A. 607. That is exactly what occurred here: people sought the experience of hope, an intangible benefit. The customers got the benefit of their bargain.

Moreover, the government made no attempt to demonstrate that there was any tangible value in letters and objects written or blessed by psychics as opposed to letters and objects from a company that licensed with Duval, a person with a "reputation" as a psychic. Indeed, the government never defined "psychic," or suggested any objective difference that would have existed if Mr. Runner's company employed psychics.

ii. Mr. Runner and his employees believed their customers were satisfied and tried to keep them satisfied.

The trial evidence also didn't prove that Mr. Runner was intending to harm his customers. On the contrary, the company believed that its customers were satisfied. Thanos testified that she thought people bought products again and again because "they like[d] what they had received." A. 247. Lett said the same. A. 521. The expert explained that it is a "well-accepted" rule that "repeat customers are satisfied

49

customers." A. 613-14. About 50% of Mr. Runner's customers bought more than once. A. 291.

Mr. Runner's employees testified that the company tried to enhance the customer's perceived value in the letters and objects they received. A. 279, 281. The company spent extra money to do so, changing the packaging to make the objects appear more unique and magical. A. 275. The company took efforts to make sure its customers could suspend their rational minds and indulge in the hope and fantasy that an object could change their luck. That does not show an intent to harm, but that the company was trying to give their customers what they were paying for: the opportunity to believe in hope that their luck would change.

Moreover, none of the cooperating employees testified that they intended to harm any customers. On the contrary, Arnold pleaded guilty because he was "scared" and thought he was guilty solely by complying lists of addresses, A. 401; Thanos thought she was guilty just because the mailings were "deceptive" because they "weren't coming from" Duval, A. 134, and Lett, believed he was guilty because he sent "deceptive mailings" for money in "exchange for cheap trinkets and computer-generated readings and booklets." A. 434-44. In other words, each of these witnesses thought incorrectly that deception was enough to be fraud.

50

iii.     Evidence that Mr. Runner tried to avoid regulators by changing his company name and address, and avoiding civil liability did not prove intent to harm.

Rather than attempt to prove an intent to harm, the government introduced extensive evidence about a 20-year old administrative action that found misrepresentation in Duval letters. It introduced evidence of civil mail seizures, complaints, and Mr. Runner's company changing names and locations numerous times.  In the light most favorable to the government, this evidence showed Mr. Runner knew his company was doing something wrong and didn't want his company shut down. There was no dispute that Mr. Runner's company sent letters with lies and knew that those misrepresentations were a regulatory problem. None of this evidence, however, was connected to an intent to harm or suggested that any harm was to a property interest.

Much of the government's case explained in detail how Mr. Runner's business received and sent mail. Nothing about that business model was fraudulent. Instead, as the defense expert testified, Mr. Runner's business model was common for mail-order companies: using lists of mailing address to find customers was normal, marketing to people over 65 was normal, and companies generally do all they can to avoid regulatory scrutiny. A. 627-28.

51

iv.     That the objects weren't "unique" was not material or harmful.

The government proved that the objects weren't unique but mass-produced. The evidence showed that the letters said some objects came from specific other places, including Paraguay, Madagascar, and a "magician" at the "edge of the world," while they actually came from PartyMart and were made in China. A. 169, 182, 202. The government, however, made no argument that it was material that the objects came from China instead of these other spots. Instead, its theory focused on the fact the objects weren't supernatural, not that they weren't from a particular country. There is no tangible harm in receiving an item from China rather than the "edge of the world," or in receiving an item that a psychic did not "set." The stories, for example of the magician at the "edge of the world," were simply part of the experience. Any possible harm is intangible, more akin to *Binday*, where insurers "believed" the type of policy was economically relevant, but it wasn't. This harm isn't cognizable.

Moreover, the evidence also didn't show that the company asserted the items, which cost only $5-45, had objective value, separate from a belief they were supernatural. The evidence did show that some items had "certificates of authenticity," but the government did not argue or attempt to prove that these certificate were materially fraudulent. For example, it didn't argue that the sapphires

52

weren't sapphires or that the crystals weren't crystal.[6] Instead, the government focused on the fact that they weren't magic: the crystals did not vibrate when held towards the moonlight, and Duval didn't "really" "set" the sapphire ring. A. 63, 503.

As with the country of origin, that the items weren't supernatural isn't a cognizable harm.

C.    The district court's ruling relied on a theory abrogated by *Ciminelli*

*Ciminelli* was decided before trial began. In the post-trial motion to dismiss, however, the district court relied on *Johnson*, 945 F.3d 606, a case based on *Binday* and a since-abrogated fraud theory. SPA 178. The court's ruling was wrong because it was based on intangible harm: saying it wasn't relevant whether psychics, astrology, or the supernatural were real, because the customers "believed" the services and products "could help them." SPA 180. That the customers believed in magic that wasn't real isn't a tangible harm.

In support, the court also cited a case upholding an indictment against a psychic, who promised to break a "curse" by "cleaning" the victim's money, and took three million dollars. *Stevens*, 2022 WL 2704522, at *2. In *Stevens* there was a psychic, that psychic took property, and the victim received nothing in return. In contrast,

---

[6] One customer testified that she believed a "moonstone" wasn't "real." A. 79. The government introduced no evidence about what a "moonstone" was and whether there were "real" ones. In any event, the jury acquitted Mr. Runner of fraud against this customer.

here, Mr. Runner offered the experience of indulging in mystery and hope, he sent customers letters of support, and he sent products customers valued, kept, and bought again. The customers received what they bargained for and Mr. Runner didn't intend to harm them.

*   *   *

In *Shellef,* this Court reversed the fraud conviction, noting that it could not "rule out" the possibility that the jury "might have erroneously convicted [the defendants] even though it concluded they didn't misrepresent an "essential element" of the bargain, but rather made simple fraudulent inducements to gain access to" the products. 507 F.3d at 109 (cleaned up). The same is true here.

Indeed, the risk that the jury may have convicted Mr. Runner on an invalid legal theory is particular high because the court failed to charge the jury that they had to find Mr. Runner had an intent to harm, *see* Point III, *supra*; the government told the jury in summation, incorrectly, that it did not need to prove an intent to harm; and, during trial, the court allowed the government to rely on sympathy, including by using letters from the trash about customers' sad lives, A. 585-86, and allowing a customer to testify falsely that she bought astrological products because of her husband's tragic illness and death. A. 264-72.

Because there was insufficient evidence that Mr. Runner committed fraud, his convictions should be reversed.

54

## Point III

**The court erred in not instructing the jury on the legal theory that was the crux of the defense case: that the government had to prove that Mr. Runner intended harm.**

When the court denied the motion to dismiss, it explained that the jury charge would "hopefully" "be presented in a clear way so the jury understands [ ] the need for this intent to harm." A. 593. This did not happen. Instead, moments before closing arguments began, the court removed language from the charge that explained the "intent to harm." A. 671. It do so over vigorous objection from the defense that the intent to harm was "critical" "to the defense theory." A. 661. Removing the crux of the defense legal theory from the jury charge right before summations was a crucial, prejudicial error. Mr. Runner's convictions should be reversed.

This Court reviews "de novo a properly preserved challenge to a jury instruction, reversing where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021) (citation omitted). "Under this standard of review, a conviction will be affirmed only 'if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (quoting *United States v. Mahaffy,* 693 F.3d 113,

136 (2d Cir. 2012)). The government bears the burden of proving harmlessness. *United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017).

Here, the jury charge did not adequately inform the jury on the law. Instead, the charge failed to mention the legal element that was the crux of the defense theory and which the court recognized the jury should understand. In *Starr*, this Court reversed not just because of insufficient evidence, but also because the "district court's charge effectively permit[ed] the jury to disregard any evidence of contemplated harm and runs afoul of our *Regent* holding." *Starr*, 816 F.2d at 101. *Accord United States v. Chandler*, 98 F.3d 711, 715 (2d Cir. 1996) ("court erred in its instructions to the jury on § 1344(1) when it defined 'scheme to defraud' …without requiring intent to harm"). The same occurred here.

This error was particularly harmful as the court had repeatedly explained it agreed that the intent to harm was the crucial element in the case, only changing its mind right before closing arguments. The defense relied on the court's ruling. Unaware the court would remove the intent to harm language until just before summation, counsel told the jury – incorrectly – that the judge would explain that the government had to prove Mr. Runner's intent to harm. This lack of intent to harm was the centerpiece of the defense argument.

This crucial change effectively meant that the jury was given no legal reason to agree with the defense theory. The charge also suggested that the government's

56

rebuttal argument that it did not have to prove any intent to harm was correct. This was exceedingly harmful in this unusual case, in which the disagreement between the parties was largely about the law, not facts.

Moreover, another aspect of the charge was also concerning: the court told the jury that the 20-year-old administrative action was "evidence tending to show that on a different occasion the defendant engaged in conduct similar to the charges in the indictment." A. 738. This charge further undermined the defense theory, implying that the administrative action required the same type of proof as the criminal case. In fact, it didn't: the administrative charge didn't require any intent to harm. This misleading instruction, combined with the error relating to the failure to charge on the element of intent to harm, added to the charge "as a whole" being prejudicial. *See United States v. Gaines*, 457 F.3d 238, 244 (2d Cir. 2006).

Accordingly, this Court should reverse.

## Point IV

**The court incorrectly calculated the guidelines loss as the entire revenue from Mr. Runner's business, ignoring evidence that some customers were satisfied with the astrological letters and products.**

At sentencing, the defense presented evidence of 12 representative customers who said they weren't financially harmed by Mr. Runner's company. The government didn't dispute the veracity of this evidence, and the court agreed with the defense that

57

there were "satisfied customers." A. 821. Despite this, the court failed to assess what percentage of customers lost money in calculating the guidelines' loss amount. Instead, it calculated the loss as the company's total revenue. This was erroneous.

This Court reviews sentences for reasonableness. *United States v. Cavera*, 550 F.3d 180, 187–88 (2d Cir. 2008) (*en banc*). A sentence is procedurally unreasonable if a district court "makes a mistake in its Guidelines calculation." *Id.* at 190 (citation omitted). This Court "review[s] a district court's factual findings as to loss amount for clear error and its legal conclusions <u>de novo</u>." *United States v. Powell*, 831 F. App'x 24, 25 (2d Cir. 2020). "In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation." *United States v. Coppola*, 671 F.3d 220, 249–50 (2d Cir. 2012). The loss amount need not be calculated with "absolute precision," but has to be a "reasonable estimate based on the available information." *Id.*

Here, the court made no reasonable estimate based on the available information, which included evidence that some customers were happy with the astrological letters and products. These customers responded to government questionnaires saying they had no financial loss, that they would recommend the company to others, and that they had kept their purchases. Dkt. 122. The court agreed with defense counsel that this evidence demonstrated some customers were satisfied. Having made that factual determination, however, the court made no effort

to determine a reasonable estimate about what percentage of customers did have losses.

The government didn't dispute the factual accuracy of these questionnaires and did not present information about what percentage of customers said they had losses. Instead, the government argued that all the customers were defrauded and that the customers own satisfaction didn't matter. A. 794-95.

The available information also included the jury's not guilty verdicts for four customers, which meant it believed the government had not proved those customers were defrauded. The court made no contrary factual finding. Instead, the court appeared to agree those customers' purchases shouldn't be counted, saying it thought the PSR didn't count them. Having made the determination, however, the court made no effort to determine a reasonable estimate about how many <u>other</u> customers had no losses.

This Court has found that a district court's methodology was not "too crude" when it calculated a loss amount based on the "total profits of the scheme" and "testimony as to the underlying percentage that was fraudulent." *United States v. Rainford*, 110 F.4th 455, 476 (2d Cir. 2024), citing *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020) (court properly relied on testimony that the fraud impacted ~70% of the customers, and, thus, used 70% of profits as the loss amount) and *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (a "court may make a reasonable estimate by

59

extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown.").

In contrast, here, the court just agreed with the government, while admitting that the "appeals process may prove [it] wrong." A. 801. The court's failure to engage in even a "crude" estimate of losses, considering its own factual findings that not all customers experienced losses, was error.

"Even though a non-Guidelines sentence was imposed ... any error in making the initial calculation of the applicable guideline range will normally undermine the validity of the resulting sentence." *United States v. Drayer*, 364 F. App'x 716, 720 (2d Cir. 2010) (remanding due to incorrect loss calculation). Accordingly, this Court should find that this calculation was erroneous, vacate Mr. Runner's sentence, and remand for a resentencing.

**Conclusion**

Accordingly, the Court should reverse Mr. Runner's conviction or vacate his

sentence.

Dated:      New York, New York
             September 12, 2024

                              Respectfully submitted,

                              FEDERAL DEFENDERS OF NEW YORK
                              APPEALS BUREAU

                              *Allegra Glashausser*

                              **ALLEGRA GLASHAUSSER**
                              Assistant Federal Defender
                              52 Duane Street, 10th Floor
                              New York, New York 10007
                              Tel.: (212) 417-8739

## CERTIFICATE OF SERVICE

I certify that a copy of this Special Appendix been served by the Court's **Appellate Case Management System (ACMS)** on the United States Attorney; Attention: **CHARLES B. DUNN, ESQ.**, United States Department of Justice, Consumer Protection Branch, 450 5th Street NW, Washington, D.C., 20001.

Dated:   New York, New York
         September 12, 2024

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

62

## CERTIFICATE OF COMPLIANCE WITH RULE 32 (a)

1. This brief complies with the type-volume limitations of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this brief contains **14,000** words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a) (5) and type style requirements of Fed. R. App. P. 32(a) (6) because:
   This brief has been prepared in a monospaced typeface using **Microsoft Word** with **14 characters per inch in Garamond** type style.

Dated: New York, New York
         September 12, 2024

*Allegra Glashausser*

**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

63