# 24-1040-CR

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————————

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

PATRICE RUNNER,
Defendant–Appellant.

————————————

On Appeal from the United States District Court
for the Eastern District of New York, No. 2:18-cr-578

————————————

**BRIEF FOR APPELLEE UNITED STATES**

————————————

BRYAN BOYNTON
Principal Deputy Assistant Attorney
General

BURDEN WALKER
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director

JOHN BURKE
Assistant Director

ANN ENTWISTLE
CHARLES B. DUNN
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
450 5th Street N.W.
Washington, DC 20001
(202) 305-3630
Ann.F.Entwistle@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................i

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUES .............................................................1

STATEMENT OF THE CASE ................................................................2

    I.    Procedural History .................................................................2

    II.    Statement of Facts ................................................................2

        A.    Runner's Scheme.......................................................3

        B.    Runner Sought to Conceal His Control and Ownership of the Scheme. ...........................................12

        C.    Victims Believed They Were Corresponding Directly With Maria Duval and Purchasing Products and Services Directly From Her...................17

        D.    Runner Was Tried and Convicted. ............................22

        E.    Sentencing.................................................................24

    III.    Rulings Under Review and Standards of Review ...............24

SUMMARY OF ARGUMENT .................................................................24

ARGUMENT ..........................................................................................26

    I.    The Indictment Properly Alleged Runner Intended to Defraud the Victims of His Fraud Scheme...........................26

        A.    Background .................................................................26

        B.    Standard of Review ....................................................27

C.     The Indictment Alleges a Scheme to Defraud.............28

II.    Sufficient Evidence Supports Defendant's Convictions. ......37

    A.     Background ....................................................................37

    B.     Standard Of Review. ....................................................38

    C.     A Rational Juror Could Find That Defendant Possessed the Requisite Intent to Defraud. ................39

III.    The District Court Properly Instructed the Jury on Intent to Defraud. ................................................................51

    A.     Background. ..................................................................52

    B.     Standard Of Review. ....................................................56

    C.     The district court correctly instructed the jury on intent to defraud, including intent to harm. ...............57

IV.    The district court correctly calculated the loss from Runner's scheme in determining the advisory Guidelines range. ..................................................................62

    A.     Background ....................................................................62

    B.     Standard of Review ......................................................64

    C.     The district court correctly calculated the actual loss from Runner's fraud based on the available evidence. ......................................................................65

CONCLUSION ....................................................................69

# TABLE OF AUTHORITIES

## Cases

*Adams* v. *Alexandria*,
878 F. Supp. 2d 685 ............................................................... 35

*Berger v. Iron Workers Reinforced Rodmen, Loc. 201*,
170 F.3d 1111 (D.C.Cir. 1999) ............................................ 49

*Ciminelli v. United States*,
598 U.S. 306 (2023) ........................................ 32, 33, 34, 50

*Hamling v. United States*,
418 U.S. 87 (1974) ................................................................ 28

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) .................................................. 49

*Jackson v. Virginia*,
443 U.S. 307 (1979) .............................................................. 39

*Nefedro v. Montgomery*,
414 Md. 585 (Md. App. Ct. 2010) ...................................... 34

*Rosales-Mireles v. United States*,
585 U.S. 129 (2018) .............................................................. 57

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011) ................................................ 57

*United States v. Alcius*,
952 F.3d 83 (2d Cir. 2020) .................................................. 39

*United States v. Alfonso*,
143 F.3d 772 (2d Cir. 1998) ................................................ 28

*United States v. Bala*,
236 F.3d 87 (2d Cir. 2000) .................................................. 57

*United States v. Bok*,
156 F.3d 157 (2d Cir. 1998) ................................................ 56

*United States v. Bryant*,
128 F.3d 74 (2d Cir. 1997) .................................................. 64

*United States v. Chandler*,
98 F.3d 711 (2d Cir. 1996) ............................................ 59, 60

*United States v. Friedman,*
    998 F.2d 53 (2d Cir. 1993) ...................................................39

*United States v. Gershman,*
    31 F.4th 80 (2d Cir. 2022)...................................................57

*United States v. Guadagna,*
    183 F.3d 122 (2d Cir. 1999) ........................................36, 41

*United States v. Han,*
    230 F.3d 560 (2d Cir. 2000) ...............................................58

*United States v. Johnson,*
    945 F.3d 606 (2d Cir. 2019) ...............................................50

*United States v. Kent,*
    821 F.3d 362 (2d Cir. 2016) ........................................64, 68

*United States v. Lacey,*
    699 F.3d. 710 (2d Cir. 2012) ...............................................64

*United States v. Mandell,*
    752 F.3d 544 (2d Cir. 2014) ...............................................64

*United States v. Martinez,*
    54 F.3d 1040 (2d Cir. 1995) ...............................................39

*United States v. Miller,*
    954 F.3d 551 (2d Cir. 2020) ...............................................57

*United States v. Moseley,*
    980 F.3d 9 (2d Cir. 2020) .......................................46, 47, 67

*United States v. Novak,*
    443 F.3d 150 (2d Cir. 2006) ...............................................41

*United States v. Pierce,*
    785 F.3d 832 (2d Cir. 2015) ...............................................39

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000) ...............................................28

*United States v. Press,*
    336 F.2d 1003 (2d Cir. 1964) ...........................................47

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970) ...................................... passim

iv

United States v. Russo,
74 F.3d 1383 (2d Cir. 1996) ................................................................ 58

*United States v. Schlatter,*
235 F. 381 (S.D. Cal. 1916) ................................................................ 35

*United States v. Shellef,*
507 F.3d 82 (2d Cir. 2007) ................................................................ 32

*United States v. Singh,*
390 F.3d 168 (2d Cir.2004) ................................................................ 66

*United States v. Starr,*
816 F.2d 94 (2d Cir. 1987) ............................................... 31, 41, 42, 59

*United States v. Stringer,*
730 F.3d 120 (2d Cir. 2013) ................................................................ 28

*United States v. Weaver,*
860 F.3d 90 (2d Cir. 2017) ...................................................... 43, 45, 47

*United States v. Weingold,*
844 F. Supp. 1560 (D.N.J. 1994) ........................................................ 35

*United States v. White,*
150 F. 379 (D. Md. 1906) ................................................................... 36

**Statutes**

18 U.S.C. §
1341 ........................................................................................... 2, 30
1343 ................................................................................................... 2
1345 ................................................................................................. 35
1349 ................................................................................................... 2
1956(h) ................................................................................. 2, 8, 9, 12
3231 ................................................................................................... 1
3553(a) ............................................................................................. 64

28 U.S.C. § 1291 ....................................................................................... 1

39 U.S.C. § 3005 .............................................................................. passim

**Rules**

Fed. R. Crim. P. 7 ................................................................................... 27

Fed. R. Crim. P. 7(c)(1) .......................................................................... 27

Fed. R. Crim. P. 29 .................................................................. 37

U.S.S.G. § 2B1.1 ..................................................................... 64

U.S.S.G. § 2B1.1(b)(1)(N) ....................................................... 63

## STATEMENT OF JURISDICTION

Defendant-Appellant Patrice Runner appeals from the judgment of conviction in a criminal case. The district court (Seybert, J.), had jurisdiction under 18 U.S.C. § 3231. Runner's judgment was imposed on April 15, 2024 and filed on the docket on April 19, 2024. Dkts. 128, 130.[1] Runner filed a timely notice of appeal on April 18, 2024, Dkt.127. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the indictment sufficiently plead that Mr. Runner engaged in a scheme to defraud.

2. Whether sufficient evidence supports the defendant's convictions for conspiracy to commit mail fraud, mail fraud, wire fraud, and conspiracy to commit money laundering.

3. Whether the district court reversibly erred when issuing the jury instruction on intent to defraud.

---

[1] References to "Dkt." are to district court docket entries in *United States v. Runner*, 18-CR-578 (JS) (E.D.N.Y). References to "GA" are to the government's supplemental appendix of trial exhibits, filed concurrently with this brief, and references to "GX" are to government trial exhibit numbers. References to "A" and "SA" are Runner's appendix and supplemental appendix, respectively.

4.      Whether the district court correctly calculated the loss caused by Defendant's scheme for purposes of sentencing.

## STATEMENT OF THE CASE

### I.    Procedural History

A grand jury sitting in the Eastern District of New York returned an 18-count indictment charging Runner with conspiracy to commit mail and wire fraud (18 U.S.C. § 1349) (Count 1); twelve counts of mail fraud (18 U.S.C. § 1341) (Counts 2-13); four counts of wire fraud (18 U.S.C. § 1343) (Counts 14-17); and conspiracy to commit money laundering (18 U.S.C. § 1956(h)) (Count 18).  Dkt. 1.

Following a two-week trial, a jury found Runner guilty of conspiracy to commit mail and wire fraud, eight counts of mail fraud, all four counts of wire fraud, and conspiracy to commit money laundering. A.826. The jury acquitted Runner on four counts of mail fraud (Counts 4, 7, 11 and 13). *Id.* The district court sentenced Runner to 120 months' imprisonment, to be followed by three years of supervised release.  A.828-829.

### II.   Statement of Facts

From 1994 through November 2014, Runner operated a fraud scheme that sent to consumers throughout the United States and Canada

fraudulent mass-mailings written to appear to be personalized letters from world-renowned psychics who claimed to possess information about the recipients and promised to help the recipients with all of the most serious troubles in their lives. Through these letters, Runner and his co-conspirators defrauded victims into paying money to receive supposedly personalized psychic services and supposedly unique and magical items directly from the psychics. All told, Runner's scheme defrauded more than 1 million American victims out of more than $175 million. GA.479 (GX.800). The government proved the following facts at trial.

## A.    Runner's Scheme.

Runner operated a mail fraud scheme in the name of purportedly world-renowned psychics Maria Duval, Patrick Guerin, and others,[2] for more than twenty years. A.427-428. Maria Duval was a real person, and Runner, through various corporate entities, licensed the right to utilize her name and image in his mailings. A.158-159, 164. However, beyond receiving royalties for the use of her name and image, neither Maria

---

[2] Though Runner sent mailings in the names of multiple purported psychics over the years, for purposes of simplicity, the government will refer primarily to Maria Duval in its description of the scheme. The vast majority of the letters were sent in the name of Maria Duval. A.428.

Duval, nor any other person purporting to be a psychic had any involvement in Runner's mailing operation. A.137-138, 162, 169, 173, 185, 191. No psychic wrote the letters sent to victims, had visions containing personal information about the victims as described in the letters, received letters or items that victims sent back through the mail, or provided any type of psychic or astrological services to the victims of the scheme. A.137-138, 162, 166-167, 173-175, 185, 191.

1. The Letters and Lies

Runner and his co-conspirators used approximately 100 different letters to defraud victims, but all of the letters were characterized by the same types of lies. A.165. All of the psychic mailings were written and designed to give the impression that they were personal letters from Maria Duval herself. A.137. Some portions appeared to be handwritten, with notes in the margins, and they were signed "Your devoted friend, Maria Duval." *See e.g.* GA.295-303 (GX.600). The text of the letters repeatedly referred to the victim by their first name, and the letters made various different claims that Maria Duval possessed specific information regarding the victim's future, obtained through visions or other means. *See e.g.*, GA.424-437 (GX.649) (telling victim that both Maria Duval and

4

Patrick Guerin had separate simultaneous visions regarding the victim's future including a large amount of money); GA.376-389 (GX.620) (letter describing the visions Maria Duval had of the recipient winning money and having other good forture and requesting a payment of $40 in exchange for a "List of Lucky Days" that will tell the recipient when and how to make the visions come true).

The letters promised that through various forms of psychic assistance and rituals that she would perform, Maria Duval could help the victim obtain the benefits she had seen in her visions. One example of a letter promising psychic services in exchange for a fee is the mailing Runner and his co-conspirators referred to as "29 Days." GA.390-401 (GX.624). 29 Days is a letter supposedly written by Maria Duval in which she claims that she had a very intense flash of clairvoyance indicating that the recipient of the letter may receive more than $200,000 on a date 29 days later. The letter then requests that the recipient fill out a questionnaire and send $45. GA.401. Maria Duval will then complete and prepare a "Grand Special Reading for Wealth and Happiness in Your Future," which the letter states will provide the recipient with "all the information you need for this first sum of money that you are going to

receive, such as, for example: the form in which the money is going to come to you…." GA.398 However, as the government established at trial, Maria Duval did not have a vision, did not write this letter and no psychic provided a "reading" for victims who sent in payments. A.137.

Some of the psychic letters asked the victim to send something back to Maria Duval that she would use to perform the promised psychic services, such as an envelope with the victim's picture. *See e.g.* GA.370 (GX.618) ("I would also ask you to send, in the green envelope enclosed, a photo of yourself…to enhance my psychic gifts about you each time I work on your case"); GA.412 (GX.634). These green envelopes, and other similar items Maria Duval asked the victim to send to facilitate the psychic services never went to Maria Duval or any other psychic. Instead, after victim payments were removed from their responses, these personal effects and other correspondence the victim believed was going to Maria Duval were thrown in the trash. A.168, 193, 585-588; GA.224-262 (GX.412, GX.451, 463).

The psychic mailings also contained material misrepresentations regarding the objects the psychics were offering to send to victims in exchange for payment. Mary Thanos, a co-conspirator who worked for

6

Runner for twenty years, testified at length about the many discrepancies between the descriptions of the products in the letters, and the products victims received. A.169-176, 181-184, 187-189, 201-203 .

One mailing offered a "vibratory crystal," which was described as a rare item from Paraguay. GA.461-478 (GX.678). The mailing stated "its very difficult, almost impossible...to get hold of crystal with such vibratory powers" because "[t]o work effectively, a Vibratory Crystal needs to be at least 5 million years old and possessed certain specific characteristics." GA.471. The letter contained a "certificate of authenticity" purportedly signed by a gemologist attesting to the crystal's age and vibratory powers. GA.469. The mailing also includes text that appears to be in Maria Duval's handwriting stating, "[Victim name], with the help of your vibratory crystal, I see you winning several lottery prizes totaling up to 51,000 within 22 days in the next lottery drawings." GA.470.

Thanos testified at trial that she sourced the crystal customers would actually receive from the supplier PartyMart, that the crystal was made in China, that no psychic programmed the crystal with vibrations, and that she did not know and had not hired the gemologist who

7

purportedly authored the certificate of authenticity. A.201-203. In an email to Thanos, Runner described this mailing as "a pretty dangerous promotion," and Thanos testified that she understood that to mean it was "more deceptive" and more likely to subject Runner to "regulatory risk…meaning that he can get in trouble." A.201; GA.26-27 (GX.159).

In another mailing, "Maria Duval" represents that the "Ring of Re" has the power to protect the wearer from danger and help them win the lottery. GA.339 (GX.613). The letter further states that Duval personally brought back sapphire's from the Ilakaka mines in Madagascar, handed them over to the best jeweler she knows to cut and hand polish and set on the Ring of Re. GA.341. The rings victims received after making payments to Runner's scheme were trinkets purchased from PartyMart in bulk for $2.81 per piece and made in China. A.169-170.

Another mailing represents that Duval travelled to India where she met a Shaman who "possesses the means to resolve all your most urgent problems and help you win prize after prize on the lottery." GA.413, 419-422 (GX.645). The letter states that the Shaman gave Duval a wrapped parcel containing a statue and directed her not to open it, but to provide it unopened to the person she wanted to help. *Id.* The letter

8

states that the statue is "charged with positive vibrations" that would "allow the regular substantial sums of wealth to come into [the recipient's] life." GA.421. The letter goes on to state that Maria Duval has a vision that the recipient will win thousands of dollars with the statue's help. *Id.* In fact, the statue a victim received after sending money to Runner's scheme was another mass-produced item from China, and Runner's co-conspirator Mary Thanos testified at trial that she directed their supplier to remove "Made in China" stickers and wrap the cheap statues in brown paper to match the picture in the mailing of the wrapped parcel from India. A.183-184.

### 2. The Mailing Cycle

The first letter a victim would receive was referred to by Runner and his co-conspirators as a "lead generator" mailing. A.433. The purpose of the lead generator mailings was to identify new victims who would send payments and were therefore vulnerable to Runner's scheme. *Id.* The lead generator mailings represented that the victim was personally selected by the psychic to receive the mailing, often because of a vision the psychic experienced. *See, e.g.*, GA.297-302 (GX 600) (stating that Maria Duval "selected you to become one of the chosen few" and "chose

9

you for several reasons"); GA.309-GA.316 (GX.601) (stating that Maria Duval "had several 'flashes' concerning you and a number of other people with the same mediumistic configuration"); GA.320-322 (GX.602) (describing Maria Duval's vision of the victims name, a date, and the amount "$28,778.00" and review of victim's "file" sent to her by "overnight courier").

In truth, Runner and his co-conspirators identified potential victims to receive his mailings by renting lead lists from other mailers. A.138, 433. Runner's co-conspirator list broker, Dan Arnold, testified about assisting Runner in renting and trading mailing lists. A.401-415. Arnold described the purchaser base for Runner's operation as lower income and over age fifty-five. A.408. At times, Runner would choose to rent only portions of a mailing list containing potential victims over a certain age. *See, e.g.,* GA.28-30 (GX.212); A.444. Runner would assemble lists of tens or hundreds of thousands of people and send each one a virtually identical mailing purporting to be a personalized letter from Maria Duval. A.437-438.

The lead generator mailings offered Maria Duval's personal services or unique and valuable items in exchange for a payment. *See e.g.*

10

GA.287-354 (GX.600-602, 613). Most of Runner's lead generator mailings also asked the victims to answer a series of personal questions, such as "Do you have any financial problems?" and "Do you feel lonely or misunderstood?" GA.328 (GX.602). When a victim responded to a lead generator mailing, their responses to the questionnaire were entered into a database. A.433. Those answers were then input into a computer program that generated a 15 or 16 page document purporting to be an individualized psychic reading from Maria Duval but that was in fact a form document with certain fillable fields generated by their questionnaire responses. GA.357-375 (GX.618) (highlighted text variable based on answers to questionnaire); A.433, 460-462, 465-467.

Once a victim made an initial payment, that person was considered a "buyer" and would receive dozens of "back-end" mailings – up to sixty different mailings over the course of the next six months. A.138-139, 434. Each back-end mailing used a different set of lies and misrepresentations to convince the victims to send more money, but they all appeared to come from Maria Duval or another psychic and requested payment for additional personalized psychic services, such as rituals or readings, or

for additional supposedly unique and valuable items. *See e.g.* GA.376-478 (GX.620, 624, 634, 645, 649, 675 and 678).

If a victim's check bounced, Runner's scheme sent a series of collection letters bearing the names of fictional employees of the "collections department" and a fictional attorney threatening legal action if the victim did not send a replacement check. A.476-481. Runner's co-conspirator Phil Lett testified that none of these people existed, and the scheme would never take any form of legal action to collect unpaid funds. *Id.*

### B. Runner Sought to Conceal His Control and Ownership of the Scheme.

In the early part of the scheme, in the 1990's, Runner operated the scheme through Canadian companies registered in his own name. A.164. As his scheme faced increasing regulatory scrutiny from the U.S. Postal Service and banks, he took steps to conceal his involvement in and control over the scheme.

On November 9, 2004, the U.S. Postal Service brought an administrative action pursuant to 39 U.S.C. § 3005 against Runner, Maria Duval, and Zodiac Zone, the corporate entity through which Runner was mailing the fraudulent psychic letters at the time. GA.32-40

(GX.400). By this action, the Postal Service sought a cease-and-desist order to stop Runner and the other named respondents from making materially false representations in the Maria Duval mailings. GA.38-39. In the answer to the complaint, Runner denied that he solicited money in the mail, operated Zodiac Zone, or used Maria Duval's name in direct mail solicitations. GA.63-64. Counsel for Zodiac Zone also provided the Postal Service with an affidavit from Balbino Alvarez, who represented that he was the director of Zodiac Zone, and Runner was not "involved in any way with the management of the company." GA.189-197 (GX.401 (original) and 402 (translation)); A.207-209. These were lies. While Balbino Alvarez owned the Zodiac Zone on paper, Runner continued to operate and direct all aspects of the Maria Duval scheme. A.207-209; GA.25 (GX.142). As a result of these false representations, the Postal Service removed Runner as a respondent to the administrative action. The administrative action culminated in a cease-and-desist agreement with the remaining respondents and was signed by Balbino Alvarez on behalf of Zodiac Zone. GA.145-159 (GX.400).

After Runner was notified of the administrative action, on January 5, 2005, he and co-conspirators created an offshore company registered

13

in Hong Kong, Destiny Research Group, with a Swiss citizen named Martin Dettling as its director on paper. A.140, 145-146, 210-211; GA.8 (GX.111). On January 18, 2005, Runner's operation also opened a new mailbox at a private mail receiving company, referred to as a "mail drop," to receive victim payments. GA.198-205 (GX.403). The scheme registered the mail drop under the name Martin Dettling and the Hong Kong entity Destiny Research Group. *Id.* From that point through the end of the scheme in 2014, the scheme used Martin Dettling's name, rather than Runner's, along with a series of corporate entities companies registered in Hong Kong, on all of the corporate registration documents, contracts with the scheme's payment processor, and mailbox registration forms for the maildrops that received victim payments. A.139-140, 145-146, 238-239; GA.9-13, 206-223 (GX.113, 115, 404, 405, 406). As Mary Thanos testified, Runner "didn't want his name on any of the companies or the accounts." A.141. Runner also gave his employees a standing order to shred any documents with his handwriting. A.177-178.

Runner and his co-conspirators were notified multiple times from 2007 through 2010 that various banks were unwilling to deposit checks made out to "Maria Duval" because they were concerned about "negative

publicity" and "scam alert pages" about Maria Duval online. GA.1-4 (GX.101, 102, 104). In response to these concerns, Runner did not change the contents of the mailings to remove the lies and misrepresentations and make the letters less fraudulent. Instead, he and his co-conspirators directed victims to make out checks to the offshore company, e.g. Destiny Research Group, rather than to the name "Maria Duval." A.216-218.

In 2010, Runner and co-conspirators opened a new offshore company in Hong Kong, Destiny Research Center, to replace the previous Destiny Research Group. GA.10-13 (GX.115). The scheme then executed a contract with its longtime payment processor in the name of this new company and opened new maildrops in Nevada and Chicago to receive victim payments in the name of the new company. GA.14-21, 206-216 (GX.404, 405, 116); A.219-220.

Runner's operation also received customer complaints from numerous other sources, including directly from customers themselves, from the Better Business Bureau, and from various states attorneys general. A.472-475.

In late 2014, Runner learned that the Nevada Attorney General had was investigating the mailing sent under the name Destiny Research

Center, the corporate name he was using for the psychic mailing operation at the time. GA.5-7 (GX.107-109); A.236-238. In response, Runner and his co-conspirators immediately stopped using the maildrop in Nevada to receive victim responses, opened a new maildrop in Arizona, and formed a new offshore company in Hong Kong called "Destiny Research Organization." A.236-238; GA.7, 9, 217-223 (GX.109, 113, 406). The scheme never used the new mail drop or began operations under the new company name, because the government obtained a temporary restraining order halting the scheme in November 2014. A.434.

Runner also took steps to hide his identity when receiving the proceeds of his criminal scheme. In the final years of the scheme, Runner received proceeds from the psychic mailing scheme to bank accounts in Liechtenstein, which he opened in the name of Direct Marketing Management, a company Runner registered in the United Kingdom. A.141-142. Runner never lived or had offices in the United Kingdom or Liechtenstein. A.142. After the criminal proceeds reached Runner's banks accounts in Liechtenstein, he transferred them to additional accounts controlled by Runner and his wife at various banks in Switzerland. GA.480 (GX.805); A.576-578.

16

**C. Victims Believed They Were Corresponding Directly With Maria Duval and Purchasing Products and Services Directly From Her.**

Trial evidence, including documents and testimony by Runner's co-conspirators and multiple victims, demonstrated that Runner's scheme succeeded in convincing victims that they were corresponding directly with Maria Duval or another psychic and that they were sending their money, personal effects, and personal letters to Maria Duval. The scheme also succeeded in making victims believe they were sending money to purchase products and services directly from Maria Duval, as falsely represented in the letters.

Throughout the course of Runner's scheme, victims would send in personal letters written to Maria Duval telling her about their lives along with their order forms and payments. A.154, 192-193; GA.224-225, 235, 240, 247, 254, 255-256, 261 (GX.412, 451, 463). In the early days of the scheme, return victim mail was opened in the office where Runner and his employees worked. According to Mary Thanos, Runner and everyone else in the operation knew about the letters from victims. A.154. From approximately 2000 through the end of the scheme in 2014, the scheme contracted with DMG, a company on Long Island, known as a "caging

service," that received and handled victim responses, including payments. A.140. Pursuant to standing instructions from Runner's scheme, the caging service removed victim orders and payments, as well as any letters from attorneys or law enforcement, from the return victim mail. GA.23-24 (GX.132); A.191-193. The rest of the correspondence, including letters and personal effects that the victims thought they were sending to Maria Duval, were thrown in the garbage. *Id.*

Five victims of Runner's scheme, as well as the daughter of another victim, testified at trial. Farida Beharry responded to the psychic mailings because she believed Maria Duval was personally corresponding with herand was going to perform rituals to help her. A.60-62. Beharry originally responded to every letter, but couldn't afford to keep responding so often. A.61. Beharry responded, "Lots of times, maybe over a hundred times…because my situation, you know, I was broke almost. So it's a lot of letters that I responded to, hoping that she will help me." *Id.* Beharry completed the actions and rituals she was directed to take by the letters, based on the belief that those actions would allow the psychics to help her. A.64-68. Beharry would not have paid money if she knew that the letters were not from Maria Duval and there was no psychic on

the other end of the correspondence promising to help her. A.69. Beharry paid more than $1,000 to Runner's scheme. GA.268-269 (GX.532).

Victim Kathy Ervin believes in psychics and when she received letters from Maria Duval, she "thought [Maria Duval] was actually set out to help people, and get them through rough times and, you know, by leading them psychically to where they needed to go." A.77. She believed she was personally corresponding with Maria Duval and that Maria Duval knew things about her. A.77-78. She purchased items from Maria Duval "because believing in psychic capability, I believed that she was sending me the real thing and it would help along the way." A.79. However, she received low quality items that "look like they were from a bubble gum machine." *Id.* One of the items she purchased was supposed to be a black moonstone, an item she is familiar with, but what she received was a white stone painted with black enamel paint. *Id.* In November 2014, Ervin sent a handwritten letter to Maria Duval, in which she stated, in part, "Just a short note to let you know that I am still listening but unfortunately I am again broke. If I send you any money I will not be able to get the things I need to survive…I firmly believe in you and want to desperately grab every offer you send my way

but right now I am not able to do that." GA.275-286 (GX.583). Ervin paid $694 to Runner's scheme in 2014. GA.273-274 (GX.567).

Ingrid Wolf testified that she believed Maria Duval was writing to her, that she purchased items offered in the letters because she was looking for hope and help, that she trusted Maria Duval, and that she thought Maria Duval was receiving her checks. A.265-268, 271. Ms. Wolf paid more than $3,000 to Runner's scheme between October 2009 and February 2014. GA.263-266 (GX.504).

Barbara Callahan received letters from Maria Duval and purchased the products offered in those letters. A.393-394. She purchased because Maria Duval promised she would receive money, and testified at trial, "[Maria Duval] said for $10, I'll send this to you, and you get money." A.393. She purchased because Maria Duval "was offering me millions of dollars." A.394. In 2014, Ms. Callahan wrote a letter to Maria Duval after receiving multiple duplicate letters and realizing the letters were not unique communications. GA.225-228 (GX.451). Ms. Callahan stated, "I don't know how you could live with your conscience. The thing that you do to people, like steal their money and lie to them, it's a shame." She further wrote, "There's no money, and you will get no more money, as you

20

got all I could beg, borrow or steal for to get all this money, and all my dreams will come true. 'No more money worries.' Thanks for nothing and I pray to God that other people will wise up as I did." *Id.*; A.395-396. Ms. Callahan paid more than $800 to Runner's scheme between 2011 and 2014. GA.267 (GX.517). Ms. Callahan's letter to Maria Duval was recovered by investigators in the garbage dumpster outside the caging service on Long Island. A.578.

Keith Aldrich believed the psychic mailings were from Maria Duval, that she was taking the psychic actions for him that were promised in the letters, that she would receive the things he sent back according to the instructions in the letters, and that she could help him with his difficulties. A.366, 368-370. It was important to him that Maria Duval herself sent the trinkets and letters and performed the psychic services, that she was in fact doing the things she promised to do, and if he knew those things were not true he would not have sent money in response to the psychic mailings. A.370, 375. Aldrich paid more than $3,000 to Runner's scheme between March 2008 and November 2014. GA.270-272 (GX.541).

21

### D.    Runner Was Tried and Convicted.

Runner's trial lasted two weeks.   The government called 12 witnesses, including two co-conspirators, Mary Thanos and Philip Lett, who worked for Runner to operate the psychic mailing scheme for twenty years, Runner's co-conspirator list broker, Daniel Arnold, who assisted him in renting lead lists, postal inspectors, the United States Postal Service attorney who handled the administrative action, victims, and the daughter of a victim.  The government offered hundreds of documentary exhibits reflecting, among other things:  100 different letters purporting to be from psychics sent as part of the scheme; spreadsheets of victims' responses and payments; Runner's communications with his co-conspirators; documents sent by the scheme to victims; evidence obtained from a search warrant executed at the caging service on Long Island, including items recovered from the trash; as well as corporate records, mail drops applications, bank records and other exhibits showing how the scheme operated.   Together, this evidence demonstrated the facts outlined *supra*, pp. 2-21.

Runner's defense centered on the argument that although the letters he sent were inarguably deceitful, his intent was to provide his

customers with entertainment, which they received. His defense hinged on the testimony of Professor Gal, offered as an expert in marketing. Gal opined that the victims here received the benefit of their bargain, because the value of astrological products is "hedonic" meaning the value comes "from the subjective experience of imagination, indulging in fantasy, and other experiential aspects of the product." A.611. He largely avoided talking about Runner's actual operation, and instead testified regarding the general characteristics of marketing. On cross-examination, Dr. Gal conceded that had not worked on the case until shortly before trial, had no role in advising Runner during the 1994-2014 period, and had never interviewed any of the persons about whom he was purportedly offering expert testimony of their subjective experiences with Runner's scheme. A.645-646.

The jury found Runner guilty of conspiracy to commit mail and wire fraud, conspiracy to commit money laundering, four counts of wire fraud, and eight counts of mail fraud. The jury acquitted Runner of four counts of mail fraud.

### E.    Sentencing

At sentencing, the district court found the actual loss from Runner's scheme to be $175 million. SPA.224. This loss amount and the other relevant enhancements under the Sentencing Guidelines resulted in a Guidelines range of life imprisonment. SPA.200. The district court made clear that it viewed the Guidelines enhancement for fraud loss to be "incredibly excessive." SPA.224-225. The court sentenced Runner to ten years imprisonment. SPA.246.

## III.  Rulings Under Review and Standards of Review

The rulings under review and the applicable standards of review are set forth in the relevant argument sections below.

## SUMMARY OF ARGUMENT

I.    The indictment sufficiently alleges that Runner intended to defraud his victims by selling them individualized psychic services he had no intention of providing and purportedly unique and valuable objects that were in fact cheap trinkets.

II.    Runner cannot satisfy the high bar necessary to overturn his convictions based on insufficient evidence. Sufficient evidence supported his convictions for conspiracy, mail fraud, and wire fraud.  The only evidence at trial that supported Runner's theory of the case, that he

merely intended to entertain his customers, was provided by expert witness Professor Gal who opined that customers buy psychic products merely for the experiential value. This opinion testimony was in direct conflict with the substantial evidence at trial that Runner intended to defraud his victims by leading them to believe they were corresponding with and sending payments to Maria Duval and that she intended to use her psychic powers to assist them with the problems in their lives and to sell them the unique and valuable items described in the letters. That Runner intended to foster exactly that belief in his victims was evidenced by, among other things: the substance of the mailings and the promises they made to victims contrasted with what was actually provided, the fact that Runner received notice of voluminous complaints that his scheme was a scam, and he responded not by changing the content of his mailings, but by hiding his involvement in the operation he owned and controlled for twenty years.

III.   The district court's jury instructions on the elements of scheme to defraud and intent to defraud were legally accurate and sufficiently instructed the jury that a defendant must do more than just

deceive his victims but must intend to cause some loss or harm to his victims.

IV.    Runner has no grounds to challenge his below-Guidelines sentence. Runner was convicted of conspiring to operate a scheme to defraud that undisputedly took $175 million from its victims. The district court correctly found this total figure to be an accurate calculation of the actual loss caused by Runner's scheme. Furthermore, in handing down a sentence that was far below the Guidelines range, the district court made clear that its Guidelines calculation did not dictate the sentence.

## ARGUMENT

## I.    The Indictment Properly Alleged Runner Intended to Defraud the Victims of His Fraud Scheme.

Runner contends that the indictment against him was insufficient because it failed to allege that he had the requisite intent to harm a property interest.  Runner-Br.38. The district court correctly found the indictment to be sufficient, and that decision should be upheld.

### A.    Background

Before trial, Runner moved to dismiss the Indictment. Dkt. 37-1. As relevant here, Runner argued that the Indictment did not allege any

cognizable intended injury to customers, because he offered his customers only entertainment, which they received. *Id*. at 14-18.

The district court denied the motion. Dkt.47. The court found that "[t]he Government has alleged that Defendant's customers did not receive what they paid for" and on that basis declined to dismiss the Indictment. *Id*. at 23. As to Runner's arguments that customers purchased his offered goods and services merely for their entertainment value and that claims about the magical and unique nature of the goods and services were mere puffery, the court rightly held that the question of Runner's intent in offering the psychic goods and services and the customers' intent in purchasing them were questions of fact for the jury. Dkt.47 at 27-33. "Whether customers chose to purchase Defendant's goods and services purely for entertainment or whether the customers had any expectations for those goods and services are matters the parties are free to address with the jury at trial." Dkt.47 at 31.

## B.    Standard of Review

Federal Rule of Criminal Procedure 7 requires that an indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" Fed. R. Crim. P. 7(c)(1). "An

indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). A review of an indictment on a motion to dismiss is limited to the language of the indictment itself and should not include the review of evidence extrinsic to the indictment. *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). The sufficiency of the indictment is a matter of law that is reviewed *de novo. United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

### C. The Indictment Alleges a Scheme to Defraud.

> 1. The Indictment alleges that Runner intended to harm his victims by misrepresenting the goods and services he would provide them in exchange for payment.

The Indictment alleges that Runner orchestrated and operated a scheme by which individuals were deceived into believing that they were personally corresponding with world-renowned psychic Maria Duval. Dkt.1 at ¶¶1 and 5-6. The Indictment further alleges that the letters Runner's scheme sent promised that in exchange for a payment, Maria

28

Duval would provide the victims personalized psychic services and unique items. Dkt.1 at ¶¶1 and 8. The Indictment alleges that in fact, victims who sent payments received only mass-produced trinkets and no psychic services. *Id.* These allegations capture the fraudulent nature of approximately 100 different fraudulent solicitation letters that Runner used in his scheme, each of which falsely stated and implied that Duval would provide different psychic services and unique and valuable items in exchange for money.

While the scheme alleged in the Indictment may seem unusual in that it offered its victims products and services that involved magic and the supernatural, the scheme is in fact a straight-forward confidence scam: victims were promised something in exchange for payment, and in return for their payments those victims received either something of significantly lower value or nothing at all.

Runner argues that the Indictment failed to properly allege a scheme to defraud because it does not allege that Runner intended to harm his victims. Runner likens this scheme to *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), where this Court reversed a mail fraud conviction because the schemes alleged involved

29

inducement to purchase through deceit, but no discrepancy between what was promised to the alleged victims and what the alleged victims received. Runner-Br.40-44.

Runner's reliance on *Regent* is misplaced. The defendants in *Regent* were engaged in "the business of selling stationery supplies." 421 F.2d at 1176. As "a preliminary part of the" sales pitch, defendants' salesmen would falsely claim that they "had been referred to the customer by a friend of the customer" or by "officers of [the customer's] firm[]," or that they had excess stationery that needed to be "disposed of." *Id.* at 1176-77. Notwithstanding these false statements, however, the "price and quality of the merchandise [were] always discussed honestly." *Id.* This Court found that the "white lies" told during the initial solicitations were not proof of a scheme to defraud under 18 U.S.C. § 1341 because the defendants' "customer[s] g[o]t exactly what [they] expected and at the price [they] expected to pay." *Id.* at 1179-80.

Here, the indictment alleged that Runner's letters lied about who they were from (psychic Maria Duval), why they were being sent (because Maria Duval had visions regarding the victim), *and*, unlike in *Regent*, what the victims would receive in exchange for their payment. Runner's

30

letters offered victims "personalized astrological services" and "unique and supernatural objects" in exchange for a fee, but the victims received only "mass produced trinkets" and "the psychics did not provide any personalized astrological services or studies." Indictment at ¶¶1, 8. Unlike in *Regent*, the indictment here alleged that Runner's misrepresentations were "directed to the quality, adequacy or price of goods to be sold." 421 F.2d at 1179.

Defendant's reliance on *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987) is equally unavailing. In *Starr*, the government alleged a scheme by which the defendants lied to their customers about *how* they would send their customers' mailings and created false postal receipt forms to support their lies, but ultimately did send their customers' mailings. 816 F.2d at 99. This court found that the defendants' customers received the timely shipping of their mail, which was the service they paid for. *Id.* Unlike in *Starr*, here the indictment alleged that Runner promised his customers personalized astrological services and studies in exchange for their payments, and no psychics provided services or astrological studies. Indictment at ¶¶1 and 8. The victims in this case did not receive the services or the products they paid for.

31

Similarly, Runner likens this case to *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), in which the misrepresentation at issue was a promise by the purchaser of chemicals that it would not resell those chemicals domestically. *Id.* at 107. The government alleged that the seller would not have engaged in the sale of chemicals were it not for that misrepresentation. *Id.* This Court reversed the fraud conviction because it found that the alleged misrepresentations did not go to the benefit of the bargain but were fraudulent inducements to the sellers to enter into a transaction that was otherwise honestly represented. *Id.* 107-109. Here, the alleged misrepresentations were not mere inducements to purchase, they went directly to the nature of the services and items offered for sale. The Court's holding in *Shellef* does not apply to the fraud scheme alleged in this case.

Finally, Runner argues based on the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), that a scheme offering intangible magical or psychic benefits can never be a criminal fraud scheme, because "magic isn't a protected property interest." Runner.Br at 41-42, 45-46. In *Ciminelli*, the Supreme Court abrogated the "right-to-control" theory of fraud, holding that the mail and wire

fraud statutes require the government to prove that depriving the victim of "money or property" was an object of the fraud, and depriving a victim of an intangible right was insufficient. 598 U.S. at 312-316 ("[T]he Government must prove not only that wire fraud defendants "engaged in deception," but also that money or property was an object of their fraud.") (quotations omitted). In this case, the government did not allege that Runner's scheme merely deprived the victims of information, as the Supreme Court found in *Ciminelli*, the Indictment alleges that Runner's victims were deprived of the benefit of their bargain in that they paid money to obtain something that they did not receive. The loss alleged to the victims is not intangible magic or belief in magic, it is the loss of money in exchange for services and items Runner promised to provide.

> 2.     Whether Runner intended his customers to believe they were purchasing products and services from a psychic or merely entertainment was a question of fact for the jury.

Runner argues that the customers of his scheme received the benefit of their bargain, because the benefit those customers were seeking and received was entertainment. Runner-Br.15, 44-45. In support of this argument, Runner cites to a number of cases in which various courts struck down local ordinances that banned psychic or

fortune-telling businesses as content-based restrictions on free speech and rejected the argument that all fortunetelling is necessarily fraudulent and therefore falls outside the protection of the First Amendment. Runner-Br.44-45. Runner quotes language from those opinions noting that fortune-tellers and magicians can be a form of entertainment in an attempt to argue that any transaction offering psychic readings in exchange for money is necessarily intended to be entertainment and cannot be a fraud scheme. *Id.*

However, none of those cases stand for the proposition that the *only* purpose of fortunetelling is to provide entertainment and as a result a psychic or fortunetelling business cannot be fraudulent. On the contrary, two of the courts Runner cites explicitly acknowledge that the appropriate way for the government to protect consumers from fraud operating under the guise of psychic prediction is through prosecution for fraud or deceptive marketing, rather than through blanket bans on psychic prediction as a category of speech. *See Nefedro v. Montgomery*, 414 Md. 585, 606-607 (Md. App. Ct. 2010) (holding that county and state laws making fraud illegal are speech-neutral means for the county to address its concerns regarding fraud practiced under the guise of fortune

telling); *Adams* v. *Alexandria*, 878 F. Supp. 2d 685, 691 ("While it is fraud and not predicting the future which is the City's concern, there are more precise ways of dealing with fraud including prosecution under state laws against theft and which prohibit unfair trade practices.").

Courts have long found the mail and wire fraud statutes to reach schemes to defraud under the auspices of supernatural or psychic powers, focusing in their analysis on allegations and evidence regarding the defendant's intent. *See United States v. Weingold*, 844 F. Supp. 1560 (D.N.J. 1994) (finding scheme to defraud for purposes of preliminary injunction under 18 U.S.C. § 1345 based on defendant sending letters promising to provide in exchange for a fee a unique pendant with the power to win money or a secret, personalized formula generated by psychics that would guarantee the recipient would receive money, when defendant only intended to provide cheap costume jewelry or a generic tract on numerology); *United States v. Schlatter*, 235 F. 381, 382-83 (S.D. Cal. 1916) (refusing to dismiss a mail fraud indictment against defendants who claimed the ability to bless ordinary objects to cure victims' ailments, finding the indictment alleged the defendants knew they could not cure any kind of disease by divine power and executed the

scheme for the purpose of obtaining money or property from the persons intended to be defrauded); *United States v. White*, 150 F. 379 (D. Md. 1906) (instructing the jury, in a case in which the defendant mass-mailed offers of personalized psychic readings and charms with special powers, that the jury was to determine whether the defendant intended to send personalized psychic readings as promised, or whether the defendant "intend[ed] to send to every applicant who paid the $1 fee the same reply, printed by thousands, and made up and sent without reference to the individual applicant"). As the district court rightly held, whether Runner intended to defraud his victims, by promising them something he never intended to provide, or whether he intended merely to entertain them, was a question of fact for the jury. Dkt.47 at 27. It is for the jury to determine the credibility of the evidence and to draw such inferences from it as are reasonable. *United States v. Guadagna*, 183 F.3d 122, 129-30 (2d Cir. 1999).

The indictment in this case accurately and sufficiently described Runner's mailing operation as a scheme to defraud his customers.

## II. Sufficient Evidence Supports Defendant's Convictions.

Runner next argues that insufficient evidence supports his convictions on mail fraud, wire fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering because the evidence did not prove he possessed the requisite intent to defraud – an element underlying all of those convictions. Runner-Br.46-54. Runner does not dispute that his mailings were deceptive, instead, he contends that the evidence failed to prove that he had any intent to harm his customers, because they received the benefit of their bargain, which was the intangible benefit of entertainment. On the contrary, the government introduced voluminous evidence at trial by which a rational jury could reject Runner's theory of the case and find that Runner possessed the requisite intent to defraud.

### A. Background

After the jury found him guilty, Runner moved for judgment of acquittal under Fed. R. Crim. P. 29. Dkt.109. As relevant here, Runner challenged the sufficiency of the evidence to prove he possessed the requisite intent to defraud, and more specifically the intent to harm his customers. Relying on the testimony of his expert witness, Professor Gal, Runner argued that the benefit of the products and services he was

37

selling was intangible, subjective experiential value. Dkt.109 at 5-7. He further argued that the evidence that Runner's customers purchased repeatedly was uncontroverted evidence that his customers were satisfied they had received the benefit of their bargain. Dkt.109 at 19-21.

The district court denied Runner's motion in a thorough, 36-page order. Dkt.116. The court explained that "there was sufficient evidence adduced at trial to allow a reasonable jury to infer Defendant's intent to harm." Dkt.116 at 16. The court highlighted evidence that Runner knowingly misrepresented the quality of the products offered in his promotions and that Runner offered psychic services with no intention of ever providing them. Dkt.116 at 16-22. The court further explained that the jury could infer Runner's intent to harm from the circumstantial evidence of his attempts to hide his involvement in the business and avoid regulatory and law enforcement scrutiny, his knowledge of the U.S. Postal Service administrative action against his operation, and numerous consumer complaints from multiple sources. Dkt.116 at 27-31.

## B. Standard Of Review.

This Court "review[s] challenges to the sufficiency of evidence *de novo*," viewing "the evidence in the light most favorable to the

government, drawing all inferences in the government's favor[,] and deferring to the jury's assessments of the witnesses' credibility." *United States v. Pierce*, 785 F.3d 832, 837-38 (2d Cir. 2015) (quotations omitted). A defendant faces a "heavy burden" when challenging the sufficiency of the government's evidence. *See, e.g.*, *United States v. Alcius*, 952 F.3d 83, 86 (2d Cir. 2020). A defendant's conviction will stand so long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Where proof of an element is through circumstantial evidence, a court must not "weigh . . . competing inferences and explanations" to determine "which explanation is more likely." *United States v. Friedman*, 998 F.2d 53, 56 (2d Cir. 1993); *see also United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("it is the task of the jury, not the court, to choose among competing inferences").

## C.   A Rational Juror Could Find That Defendant Possessed the Requisite Intent to Defraud.

Runner does not dispute that the evidence at trial demonstrated overwhelmingly that his mailing scheme was based on extensive misrepresentations and deception. The evidence demonstrated that Runner intended to deceive his victims to make them believe that they

were receiving personal correspondence from psychic Maria Duval who possessed information about the victims and had the ability to assist them in their lives. Contrary to what they stated, the letters did not come from Maria Duval, responses sent by victims did not go back to her, Duval was not performing any services or rituals, the products were not as described, and no psychics were involved in the scheme. A.137, 162, 169, 173, 185.

Instead, Runner argues that the evidence does not support a finding that he intended to harm his victims, because what his victims were purchasing was merely "the experience of indulging in mystery and hope." Runner-Br.53.

Contrary to Runner's argument, the government's evidence at trial demonstrated that what Runner was offering his victims, and what his victims paid to receive, were: (1) psychic and astrological services to be provided by a psychic, such as Maria Duval or Patrick Guerin; and (2) goods that possessed certain specific characteristics. The evidence further showed that in return for their payments, the victims of Runner's scheme received no psychic services, and cheap, mass-produced trinkets that did not possess the promised quality and value.

1.    Legal standard

Proof of a scheme to defraud requires proof of fraudulent intent, which can be shown through direct or circumstantial evidence. *Guadagna*, 183 F.3d at 129-30. Such fraudulent intent can be found where there is "a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered." *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) (quoting *Starr*, 816 F.2d at 98).

2.    A rational juror could find that Runner offered psychic services with the intention of never providing them.

Runner argues that because magic and psychics are not real, his failure to provide any of the purported services to his customers in return for their payments cannot be considered tangible harm to those customers. Runner-Br.36, 47-48. However, the relevant question is not whether psychics are real, but whether Runner *intended* his customers to believe that the letters he sent to them were offering to provide psychic services in exchange for payment, knowing full well that no psychic would provide anything in response to those payments. The government offered overwhelming evidence at trial from which a rational juror could

41

conclude that it was Runner's intent to defraud and harm his customers in this way.

The government introduced 100 different psychic letters sent as part of Runner' scheme as exhibits at trial. *See supra* pp. 3-2; *also see e.g.* GA.287-478 (GX.600, 601, 602, 613, 617, 618, 620, 624, 634, 645, 675, 678). All of these letters were designed by Runner and his co-conspirators to appear as if they were personal correspondence from Maria Duval or another psychic and offered some form of psychic assistance to help the victim in their life in exchange for payment. *Id.* Runner knew that no psychic had written the letter, possessed any information specific to the victim who received the letter, or was going to provide any form of psychic services. A.137-138, 162, 166-167, 173-175, 185, 191. A rational juror was entitled to take the lies in the letters at face value and conclude that Runner intended his victims to believe that a psychic would provide services in exchange for their payment.

     3.    A rational juror could find Runner knowingly misrepresented the quality and nature of the products he offered in exchange for the victims' money.

Co-conspirator Mary Thanos testified at length regarding the ways in which the letters misrepresented the supposedly valuable, unique, and

supernatural nature of the products they offered, when those products were in reality cheap trinkets that the scheme purchased in bulk. *See supra* pp. 6-9. A rational juror could find that Runner intended his victims to believe they would be receiving unique and valuable items directly from Maria Duval that had the qualities and characteristics described in the letters in exchange for their payments. A rational juror could find that these misrepresentations deprived the victims of Runner's scheme of the benefit of their bargain.

> 4. That victims believed services and items were from Maria Duval is circumstantial evidence of Runner's intent to defraud.

A rational jury could find that Runner's victims made payments not to purchase entertainment, but specifically because they believed that the products or services were being offered by Maria Duval and the other featured psychics. *United States v. Weaver*, 860 F.3d 90, 97 (2d Cir. 2017) (per curiam) (noting "the significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm").

The victims who testified at trial universally testified that they believed they were truly corresponding with Maria Duval, who was a psychic who was going to perform the rituals for them and send them the objects that were promised and described in the letters, and that they sent in payments in order to receive those psychic services and objects. *See supra* pp. 18-21.

For example, Keith Aldrich testified that he sent Maria Duval correspondence and that he believed the psychic mailings were from Maria Duval, that she was taking the psychic actions for him that were promised in the letters, that she would receive the things he sent back according to the instructions in the letters, and that she could help him with his difficulties. A.366, 368-370. He also testified that it was important to him that Maria Duval herself sent the trinkets and letters and performed the psychic services, that she was in fact doing the things she promised to do, and that he otherwise would not have sent money in response to the psychic mailings. A.370-375.

Similarly, Farida Beharry testified that it was important that the items she received and the promised services came from Maria Duval and she would not have sent payments if she knew there was no psychic on

44

the other end of the letter correspondence. A.68-69. All of the testifying victims' accounts had in common that they believed they were corresponding with psychics who were going to perform the rituals and send the objects promised in response for their payments.

Other evidence also shows that the psychic mailings had the intended effect on victims. Because of Runner's lies, victims wrote personal letters and enclosed personal effects, including photographs and locks of hair that they believed were going to Maria Duval. A.154, 192-193; GA.224-225, 235, 240, 247, 254, 255-256, 261 (GX.412, 451, 463). Mary Thanos testified that she saw these "life letters" in the early days of the scheme when victim mail was opened in the office where she and Runner both worked. A.154, 192-193.. Thanos testified that everyone in the office knew about these letters, including Runner. *Id.* Runner and his co-conspirators therefore knew that their customers were not just engaging with a character for entertainment but believed that they were truly corresponding with Maria Duval.

     5.    Evidence of victim complaints, the U.S. Postal Service Administrative Action, and Runner's attempts to hide his control of the scheme are circumstantial evidence of Runner's intent to defraud.

In addition to these personal accounts, the government presented evidence that Runner's operation received an onslaught of consumer complaints. The evidence at trial showed that so many people were complaining about the Maria Duval scheme online, multiple banks refused to process checks made out to Maria Duval. A.216-218; GA.1-4 (GX.101, 102, 104). Further, Runner and his co-conspirators knew that the caging service on Long Island received complaints from customers directly, from the Better Business Bureau and from state attorneys general. A.472-475.

In addition, the jury heard evidence that the U.S. Postal service attempted to stop Runner from continuing to deceive victims through the Maria Duval scheme back in 2004, but instead of making substantial changes to his mailings, Runner lied to the Postal Service about his involvement and incorporated new offshore companies through which he continued operating the scheme. *See* pp. 13-15, *supra*.

These complaints and the administrative action put Runner on notice that his behavior was misleading and unlawful. *See United States v. Moseley*, 980 F.3d 9, 27 (2d Cir. 2020) (explaining that "complaints about illegal practices by [defendant's] business served to put [him] on

46

notice of their potential illegality"); *Weaver*, 860 F.3d at 92 (noting frequency of customer complaints); *United States v. Press*, 336 F.2d 1003, 1011 (2d Cir. 1964) (complaints are "relevant on the issue of [the defendant's] intent"). Despite receiving notice of complaints and the illegality of his deceptive representations, Runner did not cease his mailing operation or change the content of his mailings in any meaningful way.

A rational juror could infer from this evidence that Runner possessed unlawful intent. *Moseley*, 980 F.3d at 27 (defendant's decision to "continue[] to operate his business despite [being on] notice makes the complaints probative of his intent to violate the law"); *Press*, 336 F.2d at 1011 ("[S]ince appellants knew that members were being misled by solicitation literature and that there was general dissatisfaction with the manner in which Buy-Rite conducted its affairs, continued operation despite this knowledge showed the existence of a scheme to defraud.").

Further, the government presented substantial evidence at trial that over the course of the scheme's twenty-year operation, Runner took many steps to conceal his role in and control over the Maria Duval scheme and hide from regulatory scrutiny. Those steps included the

47

following: (1) lying to the U.S. Postal Service regarding his ongoing control of the mailing operation in response to the administrative action in 2004; (2) incorporating offshore companies in the name of directors who exercised no real control over the mailing operation; (3) incorporating new companies and opening new maildrops to receive victim payments when the mailing operation received scrutiny by the Postal Service or a state attorney general; (4) directing employees to destroy any documentation containing his handwriting; and (5) having payments wired to accounts in the name of his offshore consultation business at a bank in a country where he did not live. *See* pp. 13-17, *supra.*

From this evidence, a rational juror could have concluded that Runner knew his scheme was fraudulent and illegal but took these steps in order to continue operating his scheme despite that knowledge.

> 6. A rational juror could reject the testimony of defense expert Professor Gal.

The *only* evidence at trial that Runner's customers sought merely intangible benefits from their purchases was the testimony of defense expert witness Professor Gal. As this Court has made clear, the jury is "free to accept or reject expert testimony, and [is] free to draw [its] own

48

conclusion." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 725 F.3d 65, 114 (2d Cir. 2013) (quoting *Berger v. Iron Workers Reinforced Rodmen, Loc. 201*, 170 F.3d 1111, 1121 (D.C.Cir. 1999)).

Professor Gal gave two primary opinions, upon which Runner relies here. First, Professor Gal testified that the value of Runner's products was "hedonic" meaning they came from "the subjective experience of imagination, indulging in fantasy, and other experiential aspects of the product." A.611. However, this expert opinion is inconsistent with the testimony of the victim witnesses at trial who testified that they purchased because they believed psychic Maria Duval was corresponding with them personally, that they were purchasing products and services from her, and that she could provide help to them in their lives. *See* pp. 19-22, *supra.*

Professor Gal further testified that generally repeat purchases are evidence that a customer was satisfied. A.613. However, Dr. Gal had not considered the possibility that Runner's victims continued to purchase because they were not *aware* that they were being defrauded, as co-conspirator Mary Thanos stated in her testimony (A.332),. or that they were satisfied until such time as they realized they were being lied to and

49

defrauded. Specifically, Professor Gal conceded on cross-examination that when he opined that Barbara Calllahan's lengthy purchase history was evidence she was a satisfied customer, he failed to take into account the letter she wrote to Maria Duval in 2014 expressing that after spending so much money, she had now realized she had been lied to. A.648-649; GA.225-228 (GX.451). The jury was free to compare this testimony with the testimony of Runner's victims and nearly all of the other evidence presented at trial and infer that Professor Gal's testimony was flawed or wholly incredible, as stated in the Court's instruction on witness credibility. A.733-735 (Court's charge).

7.   The district court did not improperly rely on the "right-to-control" theory of fraud abrogated by *Ciminelli*.

Runner asserts that in denying his Rule 29 motion, the district court improperly relied on *United States v. Johnson*, 945 F.3d 606, 613 (2d Cir. 2019), a decision that was based on the right-to-control theory of fraud that has since been abrogated by the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). Runner's implication is that the district court improperly relied on the "right-to-control" theory in its decision. However, it is clear from a review of the district court's opinion that the district court did not rely on the right-to-control theory,

50

but instead held that there was sufficient evidence for the jury to find that Runner's misrepresentations regarding the quality of the products he offered and regarding psychic services he had no intention of providing deprived victims of the benefit of their bargain. Dkt.116 at 18-19. The district court cited *Johnson* where that opinion quoted *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1182 for the principle that "fraudulent intent may be 'apparent' where 'the false representations are directed to the quality, adequacy or price of the goods themselves.'" Runner himself advocated for this language from *Regent* to be included in the jury instructions. A.660. The government's theory of the case did not rely on the right-to-control theory, the district court did not rely on that theory, and Runner's argument that the district court improperly relied on cases abrogated by *Ciminelli* is a red herring.

## III. The District Court Properly Instructed the Jury on Intent to Defraud.

Runner raises two challenges to the district court's jury instructions. Primarily, Runner contends that the district court failed to instruct the jury that the government had to prove he intended to harm his victims, not merely deceive them. Runner-Br.55-57. Runner also argues that the district court's instruction on similar acts evidence was

51

misleading. Runner-Br.57. The district court's instructions were not erroneous, and Runner's claim fails.

### A.    Background.

#### 1.    The District Court's charge to the jury

At the close of trial, the district court gave jury instructions that correctly presented the law regarding mail fraud, wire fraud, and conspiracy, including legally correct definitions of the elements "scheme to defraud," "materiality," and "intent to defraud." As relevant here, these instructions included language making clear that the defendant must intend to cause property loss or harm to his victims, not just deceive them.

The court instructed that the first element of mail fraud and wire fraud is that "there was a scheme to defraud victims of money or property by means of false or fraudulent pretenses, representations or promises." A.742. The court instructed "a scheme to defraud is any plan to deprive another of money or property by trick, deceit, deception or swindle that is reasonably calculated to deceive persons of average prudence." *Id.*.

The court further instructed that a false or fraudulent representation must be material, explaining, "The false or fraudulent

52

representation must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person in relying upon the statement in making a decision." A.743. In its discussion of materiality, the court included the following instruction, specifically requested by Runner: "Fraud requires more than deceit. A person can dissemble about many things, but a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal. A defendant's use of false representations that do not go to the quality, adequacy, or price of goods or services does not constitute fraud." *Id.*

The district court defined "intent to defraud" as follows, "Intent to defraud means to act knowingly and with the specific intent to deceive *for the purpose of causing some financial or property loss to another*. As such, it is not enough for the Government to show only that the Defendant intended to deceive the victim." A.744 (emphasis added). The court explained that the "crucial question is whether the defendant was involved in the scheme where he made material false statements or failed to disclose material information, and did so in order to *harm customers*." A.745 (emphasis added). The court further instructed, "As a practical

53

matter, then, in order to sustain the charges against the defendant on this element, the government must prove beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to deceive and, nonetheless, he associated himself with the alleged fraudulent scheme *for the purpose of causing some loss to another*." A.745 (emphasis added).

The district court also gave a standard instruction on evidence of similar acts, and for what purposes the jury could and could not consider such evidence. The district court instructed, "The government has offered evidence tending to show that on a different occasion the defendant engaged in conduct similar to the charges in the indictment." A.738. The court cautioned that "you may not consider this evidence of a similar act as a substitute for proof that the defendant committed the crime charged, nor may you consider this evidence as proof that the defendant has a criminal personality or bad character." *Id.* The court instructed that the jury could consider similar acts for only a single purpose, "If you determine that the defendant has committed the acts charged in the indictment and the similar acts as well then you may, but you need not, draw any inference that in doing the acts charged in the indictment the

54

defendant acted knowingly and intentionally and not because of some mistake, accident or other innocent reasons." *Id.* Runner did not object to this instruction before the district court.

> 2. The district court declined to include additional specific language regarding what does or does not constitute intent to harm as unnecessary and confusing.

In proposed jury instructions submitted pretrial (Dkt.83) and at the charge conference at the end of trial, Runner requested additional language further defining what did and did not constitute a legally sufficient "intent to harm." Dkt.83 at 40-42; A.656-667. The proposed additional language included the following:

> [A]n intent to harm a party to a transaction cannot be found where the Government's evidence merely indicates that the services contracted for were dishonestly completed. Similarly, the Government does not establish an intent to defraud merely by showing that the Defendant caused customers to enter into transactions they would otherwise avoid.

A.660. The government argued that this language, taken from the *Starr* and *Regent* cases, was likely to confuse the jurors who would not know what it meant for "services to be dishonestly completed" or to "enter into transactions they would otherwise avoid" without the context of the

unique facts of those cases and this Court's opinions in those cases. A.660-663, 665, 667.

During the charge conference, the district court initially stated that it would include the requested instruction, then proceeded to hear further argument from the parties on the question. A.664-667. The next morning, the court informed the parties that it declined to include these two specific sentences in the charge, finding that this instruction "interjected confusion into the charge due to its ambiguity. The charge is meant to instruct the jurors on what the law is, instructing them as to what the law is not in this context creates the possibility of confusion. The court's charge already makes clear in the main section that an intent to deceive alone is not enough to prove specific intent to defraud." A.671.

## B.    Standard Of Review.

"[A] jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Bok*, 156 F.3d 157, 160 (2d Cir. 1998). In reviewing jury instructions, this Court does not look only to the particular words or phrases questioned by the defendant, but reviews "the instructions as a

whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Al Kassar*, 660 F.3d 108, 127 (2d Cir. 2011) (quoting *United States v. Bala*, 236 F.3d 87, 94-95 (2d Cir. 2000)).

This Court reviews challenged jury instructions *de novo*, but will reverse "only if all of the instructions, taken as a whole, caused a defendant prejudice." *United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (quotations omitted). The burden of proving prejudice lies with the defendant. *Id.*

Runner did not object to the district court's instruction on similar acts evidence below, therefore his present challenge is reviewable only for plain error. *See, e.g.*, *United States v. Miller*, 954 F.3d 551, 557 (2d Cir. 2020). On plain-error review, Runner bears the burden to establish (1) error that (2) was "clear or obvious," (3) "affected the defendant's substantial rights," and (4) "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 585 U.S. 129, 134-35 (2018) (quotations omitted).

## C. The district court correctly instructed the jury on intent to defraud, including intent to harm.

Runner cannot show that the district court's instruction was erroneous, let alone prejudicially so.

57

A defendant is entitled to any legally accurate jury instruction for which there is a foundation in the evidence, but he does not have a right to dictate the precise language of the instruction. *United States v. Han*, 230 F.3d 560, 565 (2d Cir. 2000); United States v. Russo, 74 F.3d 1383, 1393 (2d Cir. 1996). "If the substance of a defendant's request is given by the court in its own language, the defendant has no cause to complain." *Id.*

Runner's argument that the district court wholly failed to instruct the jury on intent to harm is plainly inaccurate, and disregards multiple portions of the court's instructions, set out at pages 52-55, *supra*, where the court made clear that evidence solely of deceit, without evidence that the defendant intended to cause some property loss to the victim, is insufficient to establish intent to defraud. While Runner may have preferred that the court include additional language stating this principle another way, that does not render the Court's instruction erroneous.

In support of his argument that by refusing to give his preferred instruction, the district court failed to instruct the jury on intent to harm, Runner relies on two cases, *Starr* and *United States v. Chandler*, 98 F.3d

711, 715 (2d Cir. 1996). Runner.Br.56. However, both of those cases actually support the legal sufficiency of the district court's instructions on intent to harm, without the need for Runner's preferred additional language. In *Starr*, the court charged the jury on intent to defraud as follows, "To act with intent to defraud means to act knowingly, and with a specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another *or* bringing about some financial gain to one's self." *Starr*, 816 F.2d at 101 (emphasis in original). This Court found the final clause of the instruction after the word "or" to be error, as it "permits the jury to find an intent to defraud based solely on the defendants' appropriation of a benefit to themselves" without requiring evidence of "loss or injury to the victim of the fraud." *Id.* In this case, the district court gave this same instruction, but without the final clause that the court in *Starr* found to be error. A.744. ("Intent to defraud means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another."). The holding in *Starr* confirms that the district court's instruction on intent to harm, as an essential aspect of the requisite intent to defraud, was legally correct.

Similarly, in *United States v. Chandler*, this Court found the district court's instructions to be error, though ultimately not prejudicial, because the instructions on both "scheme to defraud" and "intent to defraud" were given in the disjunctive, allowing the jury to convict based on a finding of deceit without any intent to cause harm to the victim. 98 F.3d at 714 (defining a "scheme to defraud" as "conduct by which someone intends to deceive *or* to cheat another *or* by which someone intends to deprive another of something of value" and "intent to defraud" as "accompanied, ordinarily, by a desire or purpose to bring about some gain or benefit to oneself *or* by a desire or purpose to cause some loss to some person") (emphasis in original). The district court's instructions in this case on scheme to defraud and intent to defraud did not suffer from this error.

Finally, Runner's argues that the district court's decision the morning of summation not to instruct the jury with the two-sentence instruction taken from *Starr* and *Regent* that Runner requested (*see* pages 55-56, *supra*), prejudiced him because it prevented the jury from understanding the legal basis for his defense. Runner suffered no prejudice. The instructions given fairly apprised the jury of the

requirements for the government to prove intent to defraud, including the multiple references to the need to prove intent to cause loss or harm to the victims, described above. Moreover, the instructions did not limit Runner's ability to present his argument in closing that Runner did not intend to harm his customers because he intended to provide entertainment and did provide that entertainment.

Finally, Runner argues that the district court's instruction on similar acts evidence prejudiced the defendant by implying that the 2004 Postal Service administrative action required the same type of proof as the criminal case. Runner-Br.57. Runner does not go so far as to argue that the court's instruction on this point was legally incorrect. Such an argument would surely fail the high standard of plain error review, as the district court gave a standard instruction that similar acts evidence may be considered as evidence of Runner's intent, knowledge, or absence of mistake, but not for other purposes. A.738. Runner argues that this charge was "misleading" and contributed to the charge on the whole being prejudicial to the defendant.

On the contrary, the district court made no specific reference to the Postal Service administrative action or its standard of proof that was

61

liable to confuse the jury. Further, the defendant was free to, and did, cross examine the Postal Service attorney who testified regarding the administrative action, pointing to the differences between that action and a criminal prosecution. A.359-360. Runner suffered no prejudice from this standard instruction.

## IV. The district court correctly calculated the loss from Runner's scheme in determining the advisory Guidelines range.

Runner argues that the district court improperly calculated the actual loss from his scheme, because it failed to take into account that some of his customers were satisfied. On the contrary, the district's court's calculation was a conservative estimate of the actual loss from the scheme Runner operated for twenty years. Furthermore, even if the district court erred in calculating the loss amount, any such error was harmless because the district court made clear that the same sentence would have been imposed in any event.

### A. Background

At sentencing the district court found that the actual loss from Runner scheme was $175 million. SPA.244. That number was based on the total amount of money paid by victims of Runner's scheme from 1999 through 2014, as reflected in the customer database utilized by Runner

and his co-conspirators. GA.479 (GX.800). As the government explained, this was a conservative total for actual loss, as it accounted for victim payments from only fifteen years of the scheme's twenty-year duration. SPA.216-217. Under the Guidelines, this loss called for a 26-level enhancement for a loss of more than $150 million. U.S.S.G. § 2B1.1(b)(1)(N). The probation department calculated, and the court accepted that the applicable advisory Guidelines calculation called for a sentence of life imprisonment. SPA.202.

The district court made clear that its sentence was not driven by the loss guidelines, stating specifically that with respect to the loss, "this is a type of case where I think I agree with the defense, the guidelines [are] way, way off." SPA.208. In calculating the Guidelines, the court stated, "So with respect to the guidelines, which I think are incredibly excessive with the way they calculate loss, I'm going to find the guidelines to be as stated in the probation report. But there's going to be a...discount because of other factors." SPA.224-225. After expressing this disagreement with the impact of loss on the Guidelines calculation and considering the facts in 18 U.S.C. § 3553(a), the court varied downward

significantly from the advisory Guidelines range and sentenced Runner to 120 months in prison SPA.246.

## B.   Standard of Review

In reviewing Guidelines calculations, this Court reviews findings of fact, including a district court's calculation of the loss amount, for clear error. *United States v. Lacey*, 699 F.3d. 710, 719 (2d Cir. 2012). Sentencing courts must make a reasonable estimate of loss based on the available information. U.S.S.G. § 2B1.1 cmt. n.3(c); *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997). "Because the sentencing court 'is in a unique position to assess the evidence and estimate the loss based upon that evidence,' the sentencing court's 'loss determination is entitled to appropriate deference.'" *Lacey*, 699 F.3d at 719-720, *citing* U.S.S.G. § 2B1.1 cmt. n.3(c).

Even if this Court were to find error in the district court's calculation of loss, such error is harmless if "the record indicates clearly that the district court would have imposed the same sentence in any event." *United States v. Kent*, 821 F.3d 362, 367 (2d Cir. 2016) (quoting *United States v. Mandell*, 752 F.3d 544, 553 (2d Cir. 2014)

### C. The district court correctly calculated the actual loss from Runner's fraud based on the available evidence.

The jury convicted Runner, among other charges, of conspiring to commit mail and wire fraud, as well as counts of mail and wire fraud for perpetrating a scheme to defraud. All of these charges encompassed his entire twenty-year operation of the Maria Duval mailing fraud scheme. The district court correctly accepted the government's argument that, particularly in light of the conspiracy conviction, the correct basis for calculating the actual loss caused by Runner's scheme was the total amount of money paid by his victims. The undisputed evidence at trial and at sentencing from Runner's scheme's own records showed that for the last fifteen years, the scheme brought in more than $175 million from U.S. victims. GA.479 (GX.800). This was a conservative number, as it did not account for any victim payments over the first five years of the scheme's operation.

Runner argues that some portion of those payments should be discounted because some percentage of his victims were "satisfied." Runner points to two sources of evidence of satisfied customers: the jury's acquittal on four mail fraud counts and survey responses from twelve

customers who indicated that they were not financially harmed by their purchases from Maria Duval and Patrick Guerin. Runner-Br.59.

With regard to the four acquitted counts, the government noted at sentencing and the district court acknowledged, that even if the payments for those four victims were subtracted, it would not impact the Guidelines calculation, as the $175 million loss figure was $25 million above the bottom of the relevant Guidelines range. SPA.224-225. Further, it is well settled that when the offense of conviction was the entire fraud scheme, the defendant who conceived and conducted that scheme is responsible for the harm caused by the entire scheme, even if the jury acquitted on some individual fraud counts. *United States v. Singh,* 390 F.3d 168, 191 (2d Cir.2004) ("The offense of conviction here was the health-care-fraud scheme….It matters not that various phases of the execution of the scheme were rejected by the jury for reason or reasons unknown.").

Runner's argument regarding evidence of satisfied customers fails for two reasons. First, customers who expressed satisfaction with their purchases may still have been under the false impression (intentionally created by Runner) that they had been personally corresponding with

Maria Duval. The district court accepted this view of the evidence, stating at sentencing, "a portion of that, you had satisfied customers. But they're still defrauded." SPA.243-244.

Second, that a paying customer did not complain does not mean that the psychic mailings were not fraudulent or that he or she was not defrauded. *United States v. Mosely*, 980 F.3d 9, 29 (2d Cir. 2020) (rejecting argument that for purposes of loss calculation, only complaining borrowers in payday-loan scam could be deemed to have been defrauded and noting, "[t]hat a borrower may have never objected to the loan does not mean that the process that led to it was free of fraudulent representations or that those borrowers were not defrauded…"). Runner argues that in *Mosely* the "court properly relied on testimony that the fraud impacted ~70% of the customers, and, thus, used 70% of profits as the loss amount." Runner-Br. at 59. However in *Mosely*, a case involving a payday-loan scheme in which the defendant issued loans to individuals who had not consented, some of the loans were unauthorized and some were not, so the court rightly found the total loss to encompass only the percentage of loans that were unauthorized. 980 F.3d at 29. The focus, correctly, was on the defendant's actions and

67

intent, not on whether the victims complained or expressed dissatisfaction. Here, there is no legitimate, non-fraudulent portion of Runner's operation. All of the victims who sent payments to Runner's operation did so because they had received the fake psychic letters that Runner mailed with fraudulent intent, and the losses they suffered are a reasonable and appropriate basis for the actual loss calculation.

Finally, even if this Court were to find error in the district court's calculation of actual loss for purpose of the Sentencing Guidelines, such error was harmless. *See United States v. Kent*, 821 F.3d at 367 (finding error in calculating loss to be harmless where "the record indicates clearly that the district court would have imposed the same sentence in any event").

The record indicates clearly that the district court's sentence was not driven by the Guidelines loss calculation. The district court specifically stated that it agreed with the defense argument that the Defendant's Guidelines based on fraud loss are excessive, stating, "This is a type of case where I think I agree with the defense, the guidelines [are] way, way off." SPA.208. The court later stated, "So with respect to the guidelines, which I think are incredibly excessive with the way they

68

calculate loss, I'm going to find the guidelines to be as stated in the probation report. But there's going to be a [significant] discount because of other factors." SPA.224-225 (the transcript of sentencing states "signature discount," but the government believes this to be a transcription error). Accordingly, any error in calculating the Guidelines loss was harmless.

## CONCLUSION

For the foregoing reasons, the Court should affirm Runner's conviction and sentence.

Respectfully submitted,

BRYAN BOYNTON
Principal Deputy Assistant Attorney General

BURDEN WALKER
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director

CHARLES B. DUNN
Trial Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice

DECEMBER 12, 2024

JOHN BURKE
Assistant Director

*s/ Ann Entwistle*
ANN ENTWISTLE
CHARLES DUNN
Trian Attorneys
Consumer Protection Branch
Civil Division
U.S. Department of Justice
450 5th Street NW, Suite 6400 S
Washington, DC 20001
(202) 305-3630
Ann.F.Entwistle@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2024, the foregoing brief was filed via ACMS with this Court and served via ACMS on all registered filers, including counsel for defendant-appellant.


*/s/ Ann Entwistle*
Ann Entwistle
Civil Division, Consumer Protection Branch
U.S. Department of Justice

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel for the United States hereby certifies that:

1.     This brief contains 13,659 words, in compliance with the type-volume limitation of 2d Cir. R. 32.1.(a)(4)(a).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

/s/ Ann Entwistle
Ann Entwistle
Civil Division, Consumer Protection Branch
U.S. Department of Justice